Dan LOLLEY and Julie Lolley as Legal Representatives for Jonathan Geary Lolley, Deceased, Petitioners,

v.

THE UNITED STATES, Respondent.

No. 88–33V.

United States Claims Court.

Oct. 18, 1989.

Andrew W. Hutton, Wichita, Kan., for petitioners.

ORDER FOR ENTRY OF JUDGMENT [1]

ROBINSON, Judge.

In this proceeding, the Report and Recommendation for Judgment and Order was

---

1. The Reports, in footnote 1, provided that within 14 days of its filing, the parties shall designate any material therein for deletion prior to public access. No designation was submitted. This order contains no additional material. Ac-

filed July 14, 1989, and the Supplemental Report was filed September 28, 1989 by Chief Special Master Golkiewicz. The matter comes before this court pursuant to the National Childhood Vaccine Compensation Program, 42 U.S.C. § 300aa–10, *et seq.* (Supp.V, 1987) on the basis of these Reports. No objections to the Chief Special Master's findings or conclusions of law as stated in the Reports have been filed and the time to make such filings has expired.

On the basis of the Reports and after careful review of the record established in the United States Claims Court, the court finds that the matters required to be shown by petitioners have been demonstrated by a preponderance of the evidence, and that an award of compensation, attorneys' fees, and costs to petitioners' is justified.

Accordingly, it is ORDERED:

1. The Reports, including their findings and conclusions of law are adopted by the court pursuant to 42 U.S.C. § 300aa–12(d)(2), and the full Reports shall be attached hereto.

2. Judgment shall be entered for petitioners in the amount of $260,154.33, consisting of $250,000 for statutory compensation and $10,154.33 for reasonable attorneys' fees and other costs with no additional costs to be awarded.

### REPORT AND ORDER [1]

#### July 14, 1989

GARY J. GOLKIEWICZ, Chief Special Master.

This case comes before the United States Claims Court pursuant to a petition filed under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa–10 *et seq.* (Supp. V 1987) (hereinafter the Vaccine Act), in which the petitioners claim entitlement to compensation for the death of their minor child, Johnathan Geary Lolley. An evidentiary hearing was held in Manhattan, Kansas, on June 8, 1989, on this petition.

Pursuant to 42 U.S.C. § 300aa–12(c) and Vaccine Rule 18(a), and for the reasons stated below, the undersigned recommends to the assigned Claims Court judge, Judge Robinson, that the court find petitioners are entitled to an award of $250,000 for the estate of the deceased. As explained *infra*, a supplemental report on the issue of attorneys' fees and other costs shall be issued at a later date.

#### ROLE OF RESPONDENT

Counsel for the petitioners and respondent had mutually agreed upon a hearing date, June 8, 1989, at a status conference held on April 26, 1989. Richard Parker, respondent's then-counsel, was also formally notified of the June 8th hearing in an order issued by the Chief Special Master on May 9, 1989. On May 9, 1989, Mr. Parker, however, filed a notice of withdrawal as counsel for the respondent in this case, and no motion to substitute counsel was subsequently filed. Furthermore, on May 26, 1989, respondent filed with the court a formal notice indicating that the Department of Justice would no longer be representing respondent in this case, and that no other counsel would be entering an appearance at that time. Respondent was again notified by court order dated June 1, 1989, of the scheduled hearing and provided yet another opportunity to participate in the June 8th hearing either by telephone or in person. The court did not receive any notification from respondent as to its intention to participate in the hearing by the deadline set in the June 1st order. Accordingly, the June 8th hearing proceeded without participation by the respondent.[2]

cordingly, public access shall now be afforded to these Reports.

1. This report may contain information that may not be disclosed to a nonparty. *See* 42 U.S.C. § 300aa–12 (1987). Accordingly, within fourteen (14) days of the date of filing this report, the parties shall designate any material subject to § 300aa–12 and such designated material will be deleted for public access. If on review of this report there are no objections filed within the fourteen (14) day period, then it shall be deemed that there is no material subject to § 300aa–12.

2. The court received on July 11, 1989, a letter dated July 6, 1989, from respondent conceding that the medical records submitted *prior to the*

## ISSUE

The issue before the court is whether petitioners are entitled to compensation for the death of Johnathan Lolley under the provisions of the Vaccine Act. More specifically, whether petitioners have demonstrated by a preponderance of the evidence that Johnathan Lolley suffered an encephalopathy within three days of being inoculated with a DPT (diphtheria, pertussis and tetanus) vaccine or whether his death was due to other unrelated factors. *See,* § 300aa–13(a).

## FINDINGS OF FACT

1. Johnathan Lolley was born to Julie and Dan Lolley on September 10, 1987, at St. Mary's Hospital in Manhattan, Kansas. Julie Lolley gave birth by spontaneous vaginal delivery with episiotomy and repair. There was no evidence of any complications with the pregnancy or delivery. Dr. Graham Rose was the attending physician. *See* Transcript of June 8, 1989, Hearing at 7–10, 36–37 (hereinafter Tr. at ___); *see also* Petitioners' Exhibit No. 1 at 14, 24–26, 30 (hereinafter P Ex. No. 1 at ___).

2. At birth, Johnathan weighed 7 pounds–4 ounces and measured 19¾ inches in length. Apgar tests which numerically score the condition of a new born by assessing the newborn's heart rate, respiratory effort, muscle tone, reflex irritability and color, were conducted on Johnathan at one and five minutes after birth and resulted in scores of 7 and 8, respectively. Tr. at 7. Such scores indicated that Johnathan was in good health without any complications. *Id.*

3. In the "Initial Newborn Profile" writeup of Johnathan, it was noted that no risk factors or abnormalities were observed in the infant boy. P Ex. No. 1 at 65. In addition, nurses' notes remarked that Johnathan nursed well. *Id.* at 93.

4. Mother and child were discharged from the hospital on September 12, 1987. At time of discharge, there was no medical evidence of a physical problem with Johnathan. Tr. at 10. It was noted on the discharge records that Johnathan was scheduled to see Dr. Rose one week from discharge. P Ex. No. 1 at 64.

5. At the age of 11 days, Johnathan was seen by Dr. Rose for his first well-baby visit on September 21, 1987. Notes taken during the September 21 check-up indicate a "thriving" baby with "no problems." *Id.* at 190; *see also,* Tr. at 11.

6. At Johnathan's two month well-baby visit, Dr. Rose again found the infant in good health with no apparent problems. P Ex. No. 1 at 190.

7. On December 7, 1987, Johnathan received his first DPT shot in his right leg and an oral polio virus drink (hereinafter "OPV") at the Riley County Health Department. *Id.* at 94–95. Johnathan developed a small lump at the site of the injection in reaction to the DPT shot. Tr. at 40, 45.

8. On January 12, 1988, at the age of 4 months, Johnathan was again seen by Dr. Rose for his third well-baby visit. The doctor's notes from the visit again indicated a "thriving" baby boy; no abnormalities were observed. *Id.* at 191.

9. A second DPT shot and OPV drink were administered to Johnathan on February 1, 1988, at approximately 11:00 a.m., at the Riley County Health Department. *Id.* at 94–95. The second DPT shot was injected into his left leg because of the sensitivity of the right leg to the last shot. Tr. at 40.

10. The left leg in which the second shot was administered was tender to touch as Johnathan resisted breast-feeding on the side of his injection. Tr. at 45.

11. On the evening of February 1, 1988, Johnathan developed a slight fever and was

*hearing demonstrated petitioners' entitlement to compensation. However, since respondent's letter does not address other requirements under the Vaccine Act for entitlement to compensation, the court is compelled to issue this report. It is unfortunate that respondent's otherwise laudable efforts to settle this case came so late*

in the process and without the court's or petitioners' knowledge. If respondent had conducted its efforts within the context of the court's processes, the hearing in this case may have been unnecessary, thus saving substantial amounts of judicial resources and attorneys' fees and expenses.

extremely irritable and fussy. That night, Johnathan slept longer than usual. Tr. at 41–42.

12. By the early morning of February 2, 1988, Johnathan's fever of the night before was increasing. Later that night, when awakened for a feeding, Johnathan had an episode of vomiting and his fever had reached approximately 104 degrees. Johnathan's fever persisted despite being given some Tylenol. Julie and Dan Lolley called Dr. Rose regarding Johnathan's condition. Dr. Rose advised the Lolleys that Johnathan probably had the flu and instructed them to call the office the next morning if Johnathan's condition persisted. *Id.* at 42–43.

13. On February 3, 1988, at approximately 8:00 a.m., when Julie awakened Johnathan, Johnathan again vomited. Johnathan was bathed in an attempt to reduce the fever. He was put to bed after the bath. *Id.* at 43.

14. Between 10:30 and 11:00 a.m. on February 3, 1988, Julie went to Johnathan's room to wake him for his feeding. Johnathan would not nurse, but did drink some apple juice. While Julie was feeding Johnathan, Johnathan suddenly went limp. Julie called Dr. Rose's office and was advised to bring the child into the office. She also called her husband, Dan Lolley, and her mother-in-law. By the time, Julie's mother-in-law arrived at the house, Johnathan seemed to be more alert. *Id.* at 44–45.

15. At 11:30 a.m., according to the doctor's contemporaneous records, Julie and Dan Lolley brought Johnathan to Dr. Rose's office. P Ex. No. 1 at 203. On the way there, Johnathan became rigid and began "wailing." Tr. at 45. Dr. Charles Crane, a partner of Dr. Rose, examined Johnathan upon the infant's arrival. Dr. Crane found mottled coloration of the lower trunk and lower extremities and marked pallor. Dr. Crane also reported that Johnathan was quite rigid with extended extremities and a grunting cry. Dr. Crane then had Johnathan transferred to Memorial Hospital in Manhattan, Kansas, for further testing. P Ex. No. 1 at 204.

16. Johnathan was admitted to the Memorial Hospital Emergency Room at approximately 1:30 p.m. There, Johnathan underwent a series of tests, including a blood culture, throat culture, spinal fluid culture and urine culture. *Id.* at 108–110.

17. At approximately 2:55 p.m., Dr. Crane deemed it advisable to transfer Johnathan to the pediatric intensive care unit at the University of Kansas Medical Center (hereinafter UKMC). *Id.* at 202. Meanwhile, Johnathan was transferred to the intensive care unit of Memorial Hospital at approximately 3:00 p.m. At 5:00 p.m., the UKMC Flight Service arrived. Johnathan left Memorial Hospital at 5:45 p.m. and was transported by fixed aircraft to UKMC. He arrived at UKMC at approximately 7:40 p.m. and was admitted at 7:55 p.m. *Id.* at 117, 138 and 202.

18. Upon arrival at UKMC, Johnathan was in respiratory distress and was intubated as a result of such condition. Johnathan was noted by UKMC medical personnel to be mottled, and unresponsive to noxious stimuli; his eyes were fixed and dilated. P Ex. No. 1 at 138, 140. Shortly thereafter, Jonathan became asystolic and resuscitation was attempted. *Id.* at 134.

19. On February 4, 1988, a brain flow scan performed on Johnathan showed no cerebral blood flow. At approximately 1:40 p.m., a determination of brain death was made and Johnathan was pronounced dead. *Id.* at 144.

20. An autopsy was performed by Dr. Phil Munoz, a staff pathologist at the UKMC, at 6:00 p.m. on February 4, 1988. The autopsy report concluded that Johnathan had died of "massive cerebral edema of unknown etiology." *Id.* at 122.

21. The Lolleys have never filed a civil action to collect damages for the death of their deceased child, Johnathan Geary Lolley. *Id.* at 216, 219; Tr. at 46–47.

### THE STATUTORY REQUIREMENTS

The Vaccine Act provides for compensation for injuries or deaths resulting from vaccines routinely administered to children. Section 300aa–13(a)(1) of the Vaccine Act

provides that compensation shall be awarded to a petitioner if the court finds on the record as a whole—

(A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa–11(c)(1) of this title, and

(B) that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.

Pursuant to the above-referenced § 300aa–11(c)(1), petitioners must demonstrate that the petitioners' son—

(A) received a vaccine set forth in the Vaccine Injury Table ...,

\* \* \* \* \* \*

(B)(i)(I) received the vaccine in the United States or in its trust territories,

\* \* \* \* \* \*

(C)(i) sustained, or had significantly aggravated, any illness, disability, injury, or condition set forth in the Vaccine Injury Table in association with the vaccine referred to in subparagraph (A) or died from the administration of such vaccine, and the first symptom or manifestation of the onset or of the significant aggravation of any such illness, disability, injury, or condition or death occurred within the time period after vaccine administration set forth in the Vaccine Injury Table,

\* \* \* \* \* \*

(D)(ii) died from the administration of the vaccine, and

(E) has not previously collected an award or settlement of a civil action for damages for such vaccine-related injury or death.

300aa–11(c)(1).

As discussed below, the only element of § 300aa–11(c)(1) in question in this case is the third, whether or not the vaccine in effect caused the death of petitioners' son. To this end, the Vaccine Act attempts to ease the difficult burden of proving causation in a certain class of cases by providing an Injury Table (§ 300aa–14(a)) which, if the conditions are met, sets up a rebuttable presumption of entitlement to compensation.

To meet the conditions of the Injury Table, petitioners must demonstrate by a preponderance of the evidence that their son was administered one of the listed vaccines and his death resulted from one of the listed injuries, the onset of which occurred within a prescribed time-frame.

The preponderance of evidence standard requires that the trier of fact "believe that the existence of a fact is more probable than its nonexistence before [the special master] may find in favor of the party who has the burden to persuade the [special master] of the fact's existence." *In re Winship*, 397 U.S. 358, 371, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970) (Harland, J., concurring), *quoting* F. James, Civil Procedure 250–251 (1965). Mere conjecture or speculation will not establish a probability. *Snowbank Enter. v. United States*, 6 Cl.Ct. 476, 486 (1984).

Upon establishing by a preponderance of evidence the Table's conditions, the burden of proof shifts to respondent to prove that the death is "due to factors unrelated to the administration of the vaccine described in the petition." § 300aa–13(a)(1)(B). Such factors do not include "any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness, or condition." § 300aa–13(a)(2)(A). Further, if the cause of an encephalopathy (defined as "any significant abnormality of, or injury to, or impairment of function of the brain", § 300aa–14(b)(3)(A)) cannot be demonstrated by a preponderance of the evidence, "the encephalopathy shall be considered to be a condition set forth in the table." § 300aa–14(b)(3)(B).

## DISCUSSION

█ For the reasons set forth below, this court finds that the evidence presented by petitioners demonstrates by a preponderance of the evidence that petitioners are entitled to compensation under the Vaccine Act. In addition, as might be expected since respondent did not participate at the

hearing in this case, there is no evidence in the record suggesting an alternative cause of the death.

### 1. Administered a table vaccine in the United States.

Immunization records from the Riley County Health Department establish that Johnathan Lolley received a diphtheria-pertussis-tetanus vaccine (hereinafter "DPT") in the United States, specifically Kansas, thus fulfilling the requirements of parts (A) and (B) of § 300aa–11(c)(1). P Ex. No. 1 at 94.

### 2. Previous collection of award or damages.

The Lolleys averred by sworn affidavit that this action is the first action brought to recover damages for the death of their son Johnathan Lolley. Affidavit of Julie Lolley, *Lolley v. HHS*, No. 88–33V; Affidavit of Dan Lolley, *Lolley v. HHS*, No. 88–33V; *see also* Tr. at 46–47. Prior to this action, the Lolleys have received no settlement or award of damages as compensation for the death of Johnathan Lolley, thereby satisfying part (E) of § 300aa–11(c)(1).

### 3. Suffered a table injury.

The court finds that petitioners have demonstrated by a preponderance of the evidence that Johnathan suffered an encephalopathy within three days. There are two reasons for the court's finding. First, the process of reasoning by which Dr. Charles Crane, the petitioners' medical expert, supported his opinion that an encephalopathy occurred within three days persuades the court that his opinion is correct and is entitled to considerable weight. Second, the condition exhibited by Johnathan is consistent with the statutory definition of "encephalopathy."

*Expert Testimony.* Dr. Crane is a board-certified pediatrician and has practiced in the field of pediatrics for the past 35 years. Johnathan was delivered and attended by Dr. Graham Rose, a partner of Dr. Crane. As such, Dr. Crane has had the opportunity to follow the care and treatment of Johnathan during Johnathan's life. Furthermore, Dr. Crane was the physician on call on February 3, 1988, when Johnathan was brought to the office for treatment of his sudden illness. Dr. Crane supervised and then followed Johnathan's treatment until his death on February 4, 1988. As well, Dr. Crane reviewed the autopsy findings for the petitioners. Because of his experience in pediatric medicine and his familiarity with this case, Dr. Crane was considered qualified to testify as an expert as to the etiology of Johnathan's illness and subsequent death.

Dr. Crane testified that, based on his differential diagnosis [3] and the autopsy report, Johnathan suffered an encephalopathy as a result of the DPT immunization. Dr. Crane reached this conclusion by ruling out other possible causes of death and based his opinion on a reasonable degree of medical probability.

In his differential diagnosis, Dr. Crane considered pulmonary disease, kidney or urinary tract infection, throat infection, spinal meningitis and septic infection. Dr. Crane ruled out pulmonary disease (including pneumonia) because chest x-rays taken of Johnathan revealed no acute processes. Dr. Crane also eliminated the possibility of a kidney or urinary tract infection as a urinalysis proved negative. A throat examination ruled out a throat infection because Johnathan was negative for Group A Beta Strep. As well, Dr. Crane ruled out meningitis because the results of a spinal tap were normal. Finally, sepsis or blood stream infection was ruled out as a cause for the child's illness and subsequent death as the blood culture showed no bacterial growth after two weeks.

Furthermore, Dr. Crane testified that the autopsy findings showed that Johnathan's brain was markedly edematous or swollen. He explained, "[e]ncephalopathy is an inflammation of the brain and edema is a

---

**3.** "Differential diagnosis" is defined as "the determination of which one of two or more diseases or conditions a patient is suffering from, by systematically comparing and contrasting their clinical findings." *Dorland's Illustrated Medical Dictionary* 461 (27th ed. 1988).

description of the anatomical change. Encephalopathy would be [a] clinical diagnosis or etiology or cause of illness. Edema would be what you would see in an examination as a result of that, an objection finding on examination." Tr. at 26–27. Dr. Crane asserted that an autopsy finding of a massive cerebral edema is consistent with a finding that the child suffered an encephalopathy. Given the differential diagnosis and the autopsy findings, Dr. Crane, concluded to a degree of medical probability, that the DPT vaccine administered to Johnathan precipitated an encephalopathy which ultimately caused his death.

In addition, Dr. Crane's diagnostic methodology ruled out any potential alternative causes of the death. By considering other causes and subsequently eliminating them as possibilities by medical testing, Dr. Crane showed that it is highly unlikely that the injury and ultimate death was caused by something other than the vaccine. Accordingly, even with the lack of a participating respondent in this case, the court is convinced that there is not a preponderance of the evidence establishing an alternative cause for the encephalopathy.[4]

*Statutory Guidance.* The court finds, based on the record presented by petitioners, consistent with the statutory aids to interpretation of a encephalopathy that Johnathan suffered an encephalopathy as defined by the Vaccine Act. "Encephalopathy" is defined as follows:

[A]ny significant acquired abnormality of, or injury to, or impairment of function of the brain. Among the frequent manifestations of encephalopathy are focal and diffuse neurologic signs, increased intracranial pressure, or changes lasting at least 6 hours in level of consciousness, with or without convulsions.... Signs and symptoms such as high pitched and unusual screaming, persistent unconsolable [sic] crying, and bulging fontanel are compatible with an encephalopathy, but in and of themselves are not conclusive evidence of encephalopathy.

§ 300aa–14(b)(3)(A).

The autopsy findings reveal that Johnathan suffered a massive cerebral edema. The autopsy reports that the brain weighed 900 gms.; the normal range is 549–691 gms. A cerebral edema is defined as "an excessive accumulation of fluid in the brain substance ...; it may be due to various causes, including trauma, tumor, and increased permeability of the capillaries occurring as a result of anoxia or *exposure to toxic substances." Dorland's Illustrated Medical Dictionary* 530 (27th ed. 1988) (emphasis supplied). By definition, a cerebral edema clearly implies some injury to the brain, thereby satisfying the definitional requirements.

The statutory definition, above, as well, provides signs and symptoms of an encephalopathy as aids to interpretation. The court finds that the petitioners have presented evidence which establishes the presence of two or more of the signs and symptoms. Several entries from UKMC medical records noted a bulging fontanelle. *See* P Ex. No. 1 at 130, 131, 133, 134. As well, Dr. Crane and Julie Lolley have described episodes of "high pitched and unusual screaming" and "persistent unconsolable crying" by Johnathan. Dr. Crane described it as a "grunting cry." P Ex. No. 1 at 202. Mrs. Lolley testified that Johnathan's cry as "wailing." Tr. at 45. A bulging fontanelle, high-pitched and unusual screaming or inconsolable crying alone are not conclusive evidence of an encephalopathy, but the presence of two or more of such "symptoms" supports the finding that Johnathan suffered an encephalopathy.

Based on the record as a whole, the court finds by a preponderance of the evidence that Johnathan suffered an encephalopathy within three days of being inoculated with a DPT vaccine and died as a result of such injury, thereby satisfying subparts (C)(i) and (D)(ii).

4. With receipt of respondent's July 6, 1989, letter conceding entitlement (*see* n. 2 *supra*), it is fair to say that respondent likewise believes that there was no alternative cause to the injury.

## ATTORNEYS' FEES

■ The Vaccine Act contains an express statutory mandate that successful litigants be reimbursed for reasonable attorneys' fees and other costs as part of the award.[5] The Vaccine Act provides that:

(1) the judgment of the United States Claims Court on a petition filed under section 300aa–11 of this title awarding compensation shall include an amount to cover—

(A) reasonable attorneys' fees, and

(B) other costs, incurred in any proceeding on such petition.

§ 300aa–15(e). The award of attorneys' fees under the Vaccine Act is to be the exclusive payment; no additional charges are to be levied by the attorney in connection with the prosecution of a petition filed under the Act. *See* § 300aa–15(e)(3).

This court has determined that the appropriate method for computing reasonable attorneys' fees under the Vaccine Act is the "lodestar" method, subject to appropriate adjustments. *See Gregson v. Secretary of the Dept. of Health and Human Services,* No. 88–1V, Slip Op. at 7 (Cl.Ct. April 24, 1989).

The lodestar is the product of the reasonable hours expended times a reasonable hourly rate. The resulting figure is presumed to be a reasonable fee to which the petitioning attorney is entitled. *Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983). The reasonable hourly rate is "the prevailing market rates in the relevant community" for similar services by lawyers of comparable skill, experience, and reputation. *Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984).

The lodestar figure is subject to adjustment, either upward or downward, through the application of a variety of subjective factors. *See Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir.1974). Essentially, the application of these factors allow the court to adjust the objective lodestar figure to account for the particular facts and circumstances of a given case. However, many of the *Johnson* factors, such as "novelty" "complexity of issues", "results obtained", and "quality of representation" are generally reflected in billable hours or the hourly rate used in calculating the lodestar figure and, therefore, should not provide an independent basis for adjusting the award. *See Blum,* 465 U.S. at 898–902, 104 S.Ct. at 1548–51.

Against the above stated guidelines, the court reviews the petitioners' application for attorneys' fees and other costs. Petitioners' application is summarized as follows:

| Name | Position | Rate | Total Hours | Total Fees |
|------|----------|------|-------------|-----------|
| Andrew Hutton | Partner | $250.00 | 33.5 | $ 8,375.00 |
| Karen Hansen | Legal Asst. | $ 75.00 | 51.5 | $ 3,862.50 |

|  |  |
|--|--|
| Total Fees | $12,237.50 |
| · Other Expenses | $ 1,916.83 |
| Total Fees and Other Expenses | $14,154.33 |

Petitioners submitted with their post-hearing "Submission of Case to Special Master" a four page document entitled "Updated Fees and Expenses" which indicates the case involved, the date of the individual action, the employee involved in

---

**5.** The Vaccine Act also provides that the court in its discretion may award attorneys' fees and other costs in cases where an award of compensation is not made. § 300aa–15(e)(1).

the action, a brief description of the action taken, and the amount of time expended. In addition, the document contains an itemization of the other costs incurred in processing this case. This statement is appropriately specific and indicates, in the opinion of the undersigned, the reasonableness of both the costs and counsel's expenditures of time.

Petitioners request an hourly rate of $250 for Andrew Hutton, a partner in the firm of Michaud, Hutton & Bradshaw, and $75 for the legal assistant from the same firm. In support of this request, petitioners submitted the affidavits of Bradley J. Prochaska, Esq. of Wichita, Kansas, and Ted Warshafsky, Esq. of Milwaukee, Wisconsin, both certifying that the claimed hourly rates are fair and reasonable.

The court finds that the information in the record is not sufficient to establish the appropriate hourly rates in this case. As the submitted affidavits state, Mr. Hutton customarily charges for his services on a contingency basis. With that in mind, the court directed Mr. Hutton to submit affidavits of knowledgeable practitioners testifying to the level of Mr. Hutton's skill and practice in the field of personal injury law —Mr. Hutton's chief practice. This information would enable the court to place Mr. Hutton at the appropriate hourly rate on the continuum of community rates. While providing the affidavits establishing Mr. Hutton's level of ability, petitioners failed to establish the community rates for Wichita, Kansas. Without evidence of the community rates, the court is unable to determine an appropriate hourly rate for an attorney of Mr. Hutton's experience and expertise.

### CONCLUSION

It is recommended that the court find that petitioners are entitled to an award of $250,000 for the death of their son. However, petitioners' request for attorneys'

fees is denied to the extent that petitioners have failed to establish the community hourly rates for attorneys in Wichita, Kansas.

Accordingly, IT IS ORDERED, that:

Petitioners shall file with the special master within fourteen (14) days after the filing of this report the necessary documentation to establish the range of hourly rates charged by attorneys of reasonably comparable skill, experience and reputation in Wichita, Kansas.

This special master will consider the documentation and issue a supplemental report to Judge Robinson on the issue of attorneys' fees within fourteen (14) days of receipt of petitioners' filing.

### SUPPLEMENTAL REPORT [1]

#### Sept. 28, 1989

Petitioners filed a petition in this court claiming compensation in the amount of $250,000 under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa–10 *et seq.* (Supp. V 1987) (hereinafter the Vaccine Act), for the death of their minor child, Johnathan Geary Lolley. A hearing on the issue of entitlement to compensation was held on June 8, 1989, in Manhattan, Kansas. Subsequently, on July 14, 1989, the undersigned issued a report to the assigned judge in this case, Judge Robinson, recommending that an amount of $250,000 be awarded to petitioners on behalf of the estate of the deceased Johnathan Lolley. Petitioners' request for attorneys' fees, however, was denied pending the submission of additional information. *See* chief special master's Report and Order, *Lolley v. Secretary of the Dep't of Health and Human Services,* No. 88–33V (Cl.Ct. July 14, 1989).

Pursuant to the undersigned's July 14, 1989, Report and Order, petitioners submitted additional information in support of

**1.** This report may contain information that may not be disclosed to a nonparty. *See* 42 U.S.C. § 300aa–12 (Supp. V 1987). Accordingly, within fourteen (14) days of the date of filing this report, the parties shall designate any material subject to § 300aa–12 and such designated material will be deleted for public access. If on review of this report there are no objections filed within the fourteen (14) day period, then it shall be deemed that there is no material subject to § 300aa–12.

their fee petition. Based on a review of the entire record in support of petitioners' request for fees and costs, it is recommended that petitioners be awarded $10,-154.33 for reasonable attorneys' fees and other costs.

*Statutory Attorneys' Fees*

The Vaccine Act provides that a judgment on a petition awarding compensation under the Vaccine Act shall include an amount to cover reasonable attorneys' fees and other costs. § 300aa–15(e). The Vaccine Act in pertinent part provides that:

> (1) the judgment of the United States Claims Court on a petition filed under § 300aa–11 of this title awarding compensation shall include an amount to cover—
>
> (A) reasonable attorneys' fees, and
>
> (B) other costs,
>
> incurred in any proceeding on such petition.

*Id.* The award of attorneys' fees under the Vaccine Act is to be the exclusive payment; no additional charges are to be levied by the attorney in connection with the prosecution of a petition filed under the Act. *See* § 300aa–15(e)(3).

Consistent with the vast body of case law interpreting "reasonable attorneys' fees" under a variety of federal fee shifting statutes, the undersigned has determined that the appropriate method for computing reasonable attorneys' fees under the Vaccine Act is the "lodestar" method, subject to appropriate adjustments. *See* chief special master's Opinion and Order, *Gregson v. Secretary of the Dep't of Health and Human Services,* No. 88–1V, Slip Op. at 7 (Cl.Ct. April 24, 1989).

The lodestar is the product of the reasonable hours expended multiplied by a reasonable hourly rate. *Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). The resulting figure is presumed to be a reasonable fee to which the petitioning attorney is entitled. *Blum v. Stenson,* 465 U.S. 886, 897, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984). The reasonable hourly rate represents "the prevailing market rates in the relevant community" for similar services performed by lawyers of comparable skill, experience, and reputation. *Blum,* 465 U.S. at 895, 104 S.Ct. at 1547, 79 L.Ed.2d 891 (1984).

The lodestar figure is subject to adjustment, either upward or downward, through the application of a variety of subjective factors. *See Blum,* 465 U.S. at 897, 104 S.Ct. at 1548 (citing the 12 factors outlined in *Johnson v. Georgia Highway Express,* 488 F.2d 714, 717–19 (5th Cir.1974)). Essentially, the application of these factors allows the court to adjust the objective lodestar figure to account for the particular facts and circumstances of a given case. However, many of the *Johnson* factors, such as "novelty", "complexity of issues", "results obtained", and "quality of representation" are generally reflected in billable hours or the hourly rate used in calculating the lodestar figure and, therefore, should not provide an independent basis for adjusting the award. *See Blum,* 465 U.S. at 898–99, 104 S.Ct. at 1548–49.

The fee applicant carries the burden of proof. To meet said burden, the applicant must submit evidence supporting the number of hours expended and the hourly rates claimed. As Judge Harkins wrote in *Martin v. United States:*

> A party submitting an application for an award of attorney fees should present evidence that supports hours worked at the rates claimed. Where supporting documentation is inadequate, the award may be reduced accordingly. A party who seeks payment must keep records in sufficient detail that a neutral judge can make a fair evaluation of the time expended, the nature and the need for the service, and the reasonable fee to be allowed.

*Martin v. United States,* 12 Cl.Ct. 223, 227 (1987) (citing *Hensley v. Eckerhart,* 461 U.S. at 429, 433, 441, 103 S.Ct. at 1937, 1939, 1943.) To demonstrate "reasonable hours" worked, the applicant should provide contemporaneous time records and a personal affidavit in support of the fee petition. The applicant need not account for every minute expended. However, "at least counsel should identify the general subject matter of his time expenditures."

*Hensley,* 461 U.S. at 437 n. 12, 103 S.Ct. at 1941 n. 12.

The Supreme Court in *Blum* recognized that "determining an appropriate 'market rate' for the services of a lawyer is inherently difficult." *Blum,* 465 U.S. at 895 n. 11, 104 S.Ct. at 1547 n. 11. In discussing the applicants burden, the Court stated that:

> To inform and assist the court in the exercise of its discretion [to award fees], the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.

*Id.* at 896 n. 11, 104 S.Ct. at 1547, n. 11.

*Petitioners Claim for Attorneys Fees*

Petitioners filed on May 26, 1989, a seven-page document entitled "Attorney Fee Methodology". Consistent with the court's view, petitioners stated that the appropriate method for computing attorneys' fees under the Act is the lodestar method. *Id.* at 1–2. In accordance with the lodestar method, petitioners stated that the hourly billing rate in Wichita, Kansas varies from $100 to $250 per hour. *Id.* at 1. Petitioners claimed the following rates as reasonable for their counsel.

| | |
|---|---|
| Partners | $250.00 per hour |
| Associates | $125.00 per hour |
| Legal & Medical Assts. | $ 75.00 per hour |

*Id.* at 3–4.

Petitioners' counsel, Andrew W. Hutton, is a partner in the law firm of Michaud, Hutton & Bradshaw, a plaintiff's personal injury trial firm. *Id.* at 3. Mr. Hutton has been a member of the Kansas Bar since 1979. Mr. Hutton does not have an hourly rate for his services as all fees charged by the firm to date have been on a contingent fee basis. *Id.* In support of the claimed hourly rates, it was submitted that:

> [Michaud, Hutton & Bradshaw] engage in complex, scientific investigations and jury trials and are reported to be among the best in [their] field.
>
> \*  \*  \*  \*  \*  \*
>
> The firm ... has engaged primarily in the field of medical malpractice, products liability and achieved a Fifteen Million [sic] dollar verdict in a DPT case in the United States District Court for the District of Kansas, *Graham v. Wyeth,* No. 85–1481–K. The firm has spent much time and expense in becoming experts in the field of DPT litigation.

*Id.*

Also included as part of petitioners' request was an itemization of the hours spent and costs incurred by Mr. Hutton's firm in the handling of this case. The itemization includes the dates and a brief description of each service performed, whether an attorney or paralegal performed the service, and the number of hours expended on each activity.

On July 10, 1989, after the close of the evidentiary record, petitioners filed a four-page document entitled "Updated Fees and Expenses" which included two practitioners' affidavits attesting to the reasonableness of the claimed hourly rates and an updated list of expenses incurred by the law firm. Petitioners' application for fees and expenses is summarized as follows:

| Name | Position | Rate | Total Hours | Total Fees |
|---|---|---|---|---|
| Andrew Hutton | Partner | $250.00 | 33.5 | $ 8,375.00 |
| Karen Hansen | Legal Asst. | $ 75.00 | 51.5 | $ 3,862.50 |
| | Total Fees | | | $12,237.50 |
| | Other Costs | | | $1,916.83 |
| | Total Fees and Other Costs | | | $14,154.33 |

The undersigned found the application wanting, stating that:

> [T]he information in the record is not sufficient to establish the appropriate hourly rates in this case. As the submitted affidavits state, Mr. Hutton customarily charges for his services on a contingency basis. With that in mind, the court directed Mr. Hutton to submit affidavits of knowledgeable practitioners testifying to the level of Mr. Hutton's skill and practice in the field of personal injury law—Mr. Hutton's chief practice. This information would enable the court to place Mr. Hutton at the appropriate hourly rate on the continuum of community rates. While providing the affidavits establishing Mr. Hutton's level of ability, petitioners failed to establish the community rates for Wichita, Kansas. Without evidence of the community rates, the court is unable to determine an appropriate hourly rate for an attorney of Mr. Hutton's experience and expertise.

Report and Order, *Lolley*, Slip Op. at 12. However, recognizing the newness of this compensation system (although the concept of and the case law on "reasonable attorneys' fees" is well established, *see, e.g., Blanchard v. Bergeron*, — U.S. —, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989) (reaffirming the Court's view that "the lodestar approach [is] the centerpiece of attorneys' fees and awards"), the court gave petitioners a second opportunity to establish that the rates claimed for the services rendered are consistent with "those prevailing in the community for similar services performed by lawyers of reasonably comparable skill, experience and reputation." *Blum*, 465 U.S. at 896 n. 11, 104 S.Ct. at 1547, n. 11.

In response to the court's order, petitioners filed on July 26, 1989, four affidavits in support of their fee application, two of which petitioners submitted with their July 10 "Updated Fees and Expenses".

### Warshafsky and Prochaska Affidavits

The two affidavits signed by attorneys Ted Warshafsky and Bradley J. Prochaska, respectively, were submitted with the petitioners' July 10 application for attorneys' fees and costs. Except for the personal information concerning the affiant, the affidavits are identical in content and, therefore, are summarized together as follows:

—Mr. Hutton's firm specializes in DPT litigation and is well respected in that practice;

—litigation under the Vaccine Act requires a high level of skill and experience in medical litigation because of the novel and specialized medical and legal questions;

—Mr. Hutton's firm primarily charges on a contingent fee basis of 33⅓% to 50% plus expenses. The hourly rates being claimed by Mr. Hutton are "fair, and reasonable".

### Robert L. Howard Affidavit

This affidavit was submitted in response to the court's July 14, 1989, Report and Order requesting additional information. The affiant is a partner with Foulston, Siefkin, Powers & Eberhardt—the largest law firm in the state of Kansas. The affiant avers that he is well acquainted with Mr. Hutton's firm, the quality and complexity of the firm's work, and the esteemed reputation of the firm. Affiant also states that he is "generally aware of the nature and scope of the litigation involved in DPT vaccine-related injuries and the nature of the proceedings under the National Childhood Vaccine Injury Act". Based on this knowledge of the subject-matter, his familiarity with the firm and Mr. Hutton, and the factors listed in the Code of Professional Responsibility of the American Bar Association, affiant believes that the hourly rates claimed by Mr. Hutton are "justified and reasonable under the circumstances."

### Lee H. Turner Affidavit

This affidavit was also submitted in response to the court's July 14, 1989, Report and Order requesting additional information. The affiant is a partner with the law firm of Turner & Boisseau of Wichita, Kansas. Affiant engages primarily in the representation of drug manufacturers in DPT actions and charges $200 per hour for such defense work. Affiant states further that

**510**

experts in the field of DPT litigation charge from $150 to $300 per hour for such representation. Based on affiant's knowledge of Mr. Hutton and his firm, affiant states that the rates claimed by Mr. Hutton "are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."

## DISCUSSION

### 1. *Reasonable Hourly Rate*

#### A. Lead Counsel

■ Petitioners' counsel, Andrew Hutton, is requesting an hourly rate of $250 per hour. That rate represents the highest billing rate in Wichita, Kansas, the location of Mr. Hutton's firm. Attorney Fee Methodology, 1. To date, all of the firm's billings have been on a contingent fee basis. *Id.* at 3. Therefore, inquiring into Mr. Hutton's past billing practices for similar work is not helpful in evaluating the hourly rate claimed here. *Compare with Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 956 (1st Cir.1984) (court reviewed hourly rates petitioning attorneys charged in other cases in determining reasonableness of claimed rate.) Without the benefit of any historical billing practices using an hourly rate, the court is left to answer the difficult question of what a client would be willing to pay in a free market for Mr. Hutton's services. Stated another way, what is the market rate in Wichita, Kansas for lawyers of comparable skill, experience and reputation providing services similar to those provided by Mr. Hutton.

· The difficulty of answering the above question is evident in *Blum*, where the Supreme Court stated:

We recognize, of course, that determining an appropriate 'market rate' for the services of a lawyer is inherently difficult. Market prices of commodities and most services are determined by supply and demand. In this traditional sense there is no such thing as a prevailing market rate for the service of lawyers in a particular community. The type of services rendered by lawyers, as well as

their experience, skill, and reputation, varies extensively—even within a law firm. Accordingly, the hourly rates of lawyers in private practice also vary widely. The fees charged often are based on the product of hours devoted to the representation multiplied by the lawyer's customary rate. But the fee usually is discussed with the client, may be negotiated, and it is the client who pays whether he wins or loses.

*Blum*, 465 U.S. at 895 n. 11, 104 S.Ct. at 1547 n. 11.

Similar to the situation in *Blum*, wherein the Court was reviewing an award of attorneys' fees under the Civil Rights Attorney's Fees Act of 1976, the determination of the "market rate" under the Vaccine Act is without the benefit of negotiation or even discussion between attorney and client. The reasonable fee is determined by the court and paid as part of the judgment. *See* § 300aa–15(e). This award is exclusive; no additional fees may be levied by the attorney. § 300aa–15(e)(3). The absence of market conditions in such a determination is particularly telling in situations such as the instant case where there is no history of "rates charged in private representations [which] may afford relevant comparisons." *Blum*, 465 U.S. at 896 n. 11, 104 S.Ct. at 1547 n. 11. Because of the lack of market forces in setting the hourly rate, the burden of establishing the reasonableness of the claimed hourly rate is placed on the moving party. *Id.* The court finds that petitioners have failed to meet this burden.

The unstated premise of petitioners' argument is that Mr. Hutton is a highly respected lawyer in the field of personal injury litigation and therefore should receive the top hourly rate charged in the relevant community, *i.e.*, $250 per hour. The court does not take issue with Mr. Hutton's ability as a trial attorney. In all facets of this litigation, Mr. Hutton proved to be well-prepared, effective and knowledgeable. His experience with medical issues, general skill and judicious use of a legal assistant produced in an efficient manner a clear, concise, well-documented

record. What has not been established, however, is the comparability between the degree of difficulty of litigating a case under the Vaccine Act, and therefore the level of ability necessary to handle a case filed under the Act, and the types of cases and issues for which attorneys in the Wichita, Kansas locale can command the highest hourly rate of $250 per hour. In essence, petitioners failed to show that Mr. Hutton was providing "similar services" as those attorneys receiving $250 per hour. *See Blum,* 465 U.S. at 895 n. 11, 104 S.Ct. at 1547 n. 11; *see also Copeland v. Marshall,* 641 F.2d 880, 892 (D.C.Cir.1980) (en banc).

The affidavits submitted in support of the application, while concluding that the claimed rate is reasonable, were not particularly helpful in enabling the court to make an independent determination of an appropriate hourly rate. The applicant bears the burden of proof. *Blum,* 465 at 896 n. 11, 104 S.Ct. at 1547 n. 11; *Martin,* 12 Cl.Ct. at 227. "[G]eneralized and conclusory 'information and belief' affidavits from friendly attorneys presenting a wide range of hourly rates will not suffice." *Nat. Ass'n of Concerned Vets. v. Sec. of Defense,* 675 F.2d 1319, 1325 (D.C.Cir.1982). Therefore, the applicant must submit specific, detailed evidence of the relevant community rate. Affidavits used for this purpose should, for example, state the rates charged by attorneys with similar qualifications performing similar work for fee-paying clients. *Id.* Other useful guides include recent fees awarded by courts or awarded through settlement to attorneys of comparable abilities and reputation. *Id.* This would be useful, however, only if "issues of comparable complexity were raised." *Id.* at 1325 n. 7. The affidavits submitted here fell wide of this mark.

The four affidavits, two of which being identical except for personal information, speak in general of the level of skill and experience necessary to litigate complex medical issues. Based on this premise, the affidavits conclude that an hourly rate of $250 is reasonable.

The Warshafsky and Prochaska affidavits (identical in content) contain the following statement:

Personal injury, medical malpractice, products liability and DPT cases, such as the cases Mr. Hutton has filed under the National Childhood Vaccine Injury Program, involve novel and specialized questions of medicine, law and fact and call into play requisite skills developed only by experience in this area of litigation.

Petitioners' Exhibits in Support of Attorney Fees.

The Howard affidavit states that the affiant is "generally aware of the nature and scope of the litigation ... and the nature of the proceedings under the ... [Vaccine] Act." *Id.* The Turner affidavit makes no statement regarding the Vaccine Act.

A comparison of the degree of skill and knowledge necessary to litigate medical issues under traditional torts standards with that necessary under the Vaccine Act is the type of information the court is looking for in assessing whether there is comparability in the "services" rendered for purposes of determining a reasonable hourly rate. Based on the general statements contained in the submitted affidavits, the court is not persuaded that the affiants understand or have detailed personal knowledge of the nature and the scope of the proceedings under the Vaccine Act, and therefore the degree of skill and knowledge necessary to litigate cases under the Act.

The Vaccine Act sets up an alternative to traditional litigation. The Act created a new system for providing compensation for injuries or deaths resulting from vaccines routinely administered to children. *See* § 300aa–10(a). Under this compensation system, petitioners are entitled to an award if it is demonstrated that petitioners suffered a certain illness or condition within a specified period of time following the administration of a specific vaccine and suffered such vaccine-related illness or condition for at least six-months or died from the administration of the vaccine. § 300aa–11(c)(1) and 300aa–13(a)(1)(A). Upon petitioners' adequate showing, compensation shall be awarded subject only to

respondent proving an alternative cause for the injury or death. § 300aa–13(a)(1)(B).

While medical issues may remain in controversy, in most cases, such issues narrowly focus on the specific showing that the individual sustained or significantly aggravated a particular injury within a specified time frame after receiving the vaccine. § 300aa–14(a). The Act is "intended to compensate persons with recognized vaccine injuries without requiring the difficult individual determinations of causation of injury and without a demonstration that a manufacturer was negligent or that a vaccine was defective." H.R.Rep. No. 908, 99th Cong.2d Sess., pt. 1, at 12, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6344, 6353; *see also* § 300aa–11(c)(1)(C)(i) and 300aa–13(a)(1). Therefore, where injury and time of occurrence fit the Vaccine Act's injury table (*see* § 300aa–14(a)), causation is deemed to exist. Even where either the type of injury or the time frame is "outside" the table, causation must be proven but the Act eliminates the difficult proof of manufacturer or physician negligence, or defective product. § 300aa–11(c)(1)(C)(ii)(I)–(II).

The reduced burden of proof was designed for victims to be compensated in a fair and expeditious manner. The lessened burden of proof has also resulted in a straightforward, simplified proceeding. For example, the first action in this case was a telephone conference call held on February 28, 1989. During the course of a subsequent telephonic status conference held on April 26, 1989, an evidentiary hearing was scheduled for June 8, 1989. The hearing on June 8 lasted just over two hours. Three witnesses appeared on behalf of petitioners; a medical expert and the petitioners themselves. Since counsel for respondent had withdrawn from participating in this case prior to the hearing, there was neither cross-examination of petitioners' witnesses nor rebuttal testimony. The only post-hearing submissions in this case dealt with the attorney fees issue. Thus, the evidentiary record was completed in a period of approximately three and one-half months and required a minimum number of written filings. While speed is not necessarily indicative of simplicity, the narrow focus of the issues and the Act's simplified litigation process are factors in determining the skill and knowledge needed to handle a case.

The purpose of a fee award is to provide sufficient incentive to enable attorneys to litigate a class of cases. The Vaccine Act's use of "reasonable attorneys' fees" as the standard for such an award recognizes that "market rates" will reflect the level of compensation necessary to attract profit-making attorneys. While the court is mindful of Congress' admonition that the court make "adequate provision" for attorneys' time so as not to "limit petitioners' ability to obtain qualified assistance" (H.R. Rep. No. 908, 99th Cong.2d Sess., pt. 1, at 22, *reprinted in,* 1986 U.S.Code Cong. & Admin.News 6344, 6363), the court finds that, in this case, petitioners have failed to establish that the claimed rate is consonant with the fees charged in the relevant community for services of similar complexity and difficulty.

In setting an appropriate hourly rate for Mr. Hutton, the court finds particularly helpful the affidavit of Lee H. Turner, a defense lawyer in DPT cases. Updated Fees and Expenses, Turner Affidavit. Mr. Turner is a partner with the law firm Turner & Boisseau. The firm has offices in Wichita, Great Bend and Kansas City, Kansas. Affiant charges $200 per hour for DPT litigation and notes that "experts in the field of DPT litigation charge from $150.00 to $300.00 per hour" for their services. *Id.* Mr. Hutton requested an hourly rate of $250.00. Balancing the reduced burden of proof under the Vaccine Act with Mr. Hutton's skill and experience, the special master finds $200 per hour to be a reasonable rate in this case.

**B. Legal Assistant**

█ Petitioners claim $75 per hour for the services performed by Karen Hansen, a legal assistant at the firm of Michaud, Hutton & Bradshaw. In support of such hourly rate, petitioners submitted the same four affidavits submitted in support of Andrew

Hutton's requested hourly rate. Petitioners' Exhibits in Support of Attorney Fees. The affidavits do not contain a specific discussion of Ms. Hansen or of legal assistants in general. The affiants summarily conclude that a $75 per hour rate is reasonable. *Id.* For the reasons discussed above with regard to Mr. Hutton's hourly rate, the court finds the affidavits to be of no assistance on this issue.

The legal assistant rendered services such as researching the law, drafting documents, collecting and copying relevant records, and scheduling the expert witness for the hearing. *See* Updated Fees and Expenses. The special master recognizes that Mr. Hutton's use of a legal assistant in this case was essential to its efficient and inexpensive resolution. As a matter of policy, the use of legal assistants and paralegals greatly reduces the cost of legal services in these cases and thus is a practice to be encouraged. This, in of itself, however, does not justify an hourly rate of $75. Given that the allowable hourly rate for attorneys awarded under the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A) (Supp. III 1985), is $75, it would be unreasonable to award a legal assistant who has not received the same legal training as a practicing attorney the same hourly rate. Therefore, the special master finds that a reduced hourly rate of $50 to be reasonable rate in this case.

### 2. *Reasonable Hours Expended*

■ In determining the reasonableness of time spent, the court in *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945 (1st Cir.1984), "look[ed] to the documents submitted to the courts and to the hours claimed to determine whether a reasonable number of hours was spent, given the nature of the task at hand and the results achieved." *Grendel's Den* at 952. Those hours which reflect "excessive, redundant or unnecessary" hours shall be excluded. *Hensley,* 461 U.S. at 434. In requesting statutory attorneys' fees, an attorney must use the same "billing judgment" as that used in

billing a client. "Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." *Copeland v. Marshall,* 641 F.2d 880, 891 (D.C.Cir.1980) (en banc) (emphasis in original). After careful scrutiny, the following hours are found to be either excessive, redundant or unnecessary and therefore, are excluded.[2]

First, petitioners have claimed one hour of legal assistant time to "check mailing requirements, prepare mailings for certified mail." This appears to be unreasonably long, and therefore, is reduced to one-half hour.

Second, there is an entry of eight hours for the attendance by the legal assistant at a "DPT Meeting to discuss Act cases and hear speakers from U.S. Claims Court." This expenditure of time is disallowed. Although cognizant of the notation that the total amount of time spent at this meeting has been apportioned to all "pending DPT cases," the special master finds that such an expenditure of time is not properly billable.

Third, petitioners claimed one hour of attorney time and one hour of legal assistant time to "schedule expert witness, Dr. Cole [and] contact clients re[:] hearing 6/8/89." This is a ministerial task and hardly seems worthy of two hours of attorney and paralegal time. One hour at paralegal rates is allowed.

Fourth, the one hour expenditure of attorney time for the "informal meeting of counsel—telephone call to Dept. of Justice" is disallowed. Richard Parker, respondent's then-counsel, filed a notice of withdrawal on May 9, 1989, and no further appearance for respondent was entered subsequently. In fact, on May 26, 1989, respondent filed with the court a formal notice indicating that the Department of Justice would no longer be representing respondent in this case, and that no other counsel would be entering an appearance at that time. Since there was no counsel

---

2. The special master's July 14, 1989, Report and Order issued in this case had initially found counsel's expenditures of time to be reasonable.

However, upon further review, the special master reverses that determination as to the discussed hours.

representing respondent on the date of this entry, this time must be excluded.

Fifth, petitioners claimed one hour of attorney time and two hours of legal assistant time for "telephone calls to obtain Affidavits from counsel to support attorney fees, drafting and review of Affidavits to support fees." This is clearly excessive. Furthermore, it should not be the task of the petitioners to prepare the affidavits of other attorneys. One-half hour of legal assistant time for contacting the affiants and one-half hour of attorney time for the review of such affidavits is allowed.

Sixth, the June 14, 1989, entry of one hour for the ordering of the hearing transcript and a follow-up call to Heritage Reporting Company regarding such orders is excessive. An amount of one-half hour is allowed.

Finally, the entry of one-half hour for a "telephone call to Lora [sic] Radack to inform Special Master no further evidence will be necessary to submit claim for decision" is also excessive. A quarter hour is allowed.

Accordingly, the time expenditures for attorney hours are reduced by a total of 2.5 hours and legal assistant hours are reduced by a total of 10.75 hours. The special master finds that reasonable attorneys' fees should be awarded as follows:

| | | |
|---|---|---|
| Andrew Hutton | 31.00 hours at $200/hour = | $6,200.00 |
| Karen Hansen | 40.75 hours at $ 50/hour = | $2,037.50 |
| Total | 71.75 hours | $8,237.50 |

---

### 3. *Reasonable Other Costs*

In scrutinizing petitioners' entries of other costs totalling $1,916.83, the special master finds that the costs incurred in this case appear reasonable, and therefore, awardable.

### CONCLUSION

In accordance with the findings in the Report and Order filed on July 14, 1989, and this Supplemental Report, it is recommended that judgment be entered for petitioners in the amount of $260,154.33, consisting of $250,000 of statutory compensation and $10,154.33 for reasonable attorneys' fees and other costs.