Anthony MONTEVERDI, Personal Representative of the Estate of Thomas Monteverdi, Deceased, Petitioner,

v.

SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 88–78–V.

United States Claims Court.

Jan. 26, 1990.

Anthony M. Colantoni, Chicago, Ill., attorney of record for petitioner. Kenneth B. Moll, of counsel.

Michael P. Milmoe, Washington, D.C., with whom was Asst. Atty. Gen., Stuart M. Gerson, for respondent.

## OPINION [1]

REGINALD W. GIBSON, Judge:

Under the National Childhood Vaccine Compensation Program, 42 U.S.C. §§ 300aa–10 to 300aa–33 (West Supp.1989), subject case comes before the court on the Report and Recommendation of Special Master David A. Gerard, filed on December 5, 1989. In said report, the Special Master, based on the petition of the deceased's estate and the evidence proffered, made the following recommendation:

| Item | Claim of Petitioner | Special Master's Recommendation |
|---|---|---|
| Death Award | $250,000.00 | $250,000.00 |
| Reasonable attorney fee | 16,865.00 | 16,490.00 |
| Costs | 8,808.65 | 7,874.65 |
| | $275,673.65 | $274,364.65. |

Petitioner's claim stems from the death of his son, Thomas A. Monteverdi, allegedly resulting from the administration of a DPT vaccination, *i.e.*, diphtheria, pertussis, and tetanus inoculation, which caused the now deceased to suffer either an encephalopathy and shock-collapse or hypotonic-hyporesponsive collapse ("HHC" or "shock collapse").

---

1. This decision may contain information that should not be disclosed to a non-party. *See* 42 U.S.C. § 300aa–12 (West Supp.1989). Accordingly, within 14 days of the date of this decision, the parties shall file a memorandum designating any material subject to § 300aa–12 and such material will be deleted for public access. If upon review of this decision, there are no objections filed on or before the expiration of the 14 days, it shall be deemed that there is no material subject to § 300aa–12.

At a hearing on the merits held on September 29, 1989, the petitioner called two witnesses, Theresa Monteverdi (the deceased's mother) and Dr. M.R. Geier, petitioner's expert witness. Additionally, documentary evidence consisting of nine (9) exhibits were proffered by petitioner. The Secretary, although notified, failed to appear[2] at the hearing or to offer evidence. However, he did submit a medical report which was admitted as a court exhibit. No objection was asserted to the receipt of said medical report and the Special Master received the contents thereof in evidence.

The Special Master, in his Report and Recommendation, properly identified and addressed each statutory element petitioner is required to prove. Additionally, he found that each of the following elements was proved by a preponderance of the evidence:

(i) a petition was properly filed under § 300aa–11;

(ii) the deceased received a vaccine listed in the Vaccine Injury Table (VIT), § 300aa–11(c)(1)(A), identified as a DPT vaccine, § 300aa–14(a)(I);

(iii) the vaccine was administered in the United States, § 300aa–11(c)(1)(B)(i)(I);

(iv) the deceased died from the administration of the vaccine listed on the VIT and the first symptom or manifestation of the onset or of significant aggravation of such condition or death occurred within the specified time limited on the VIT, § 300aa–11(c)(1)(C)(i), or beyond the specified time frame but which was caused by the administration of the vaccine, § 300aa–11(c)(1)(C)(ii)(II). Additionally, the injury suffered was encephalopathy and shock collapse, § 300aa–14(a)(I)(B) and § 300aa–14(a)(I)(C), respectively;

(v) the deceased died from the administration of said vaccine, § 300aa–11(c)(1)(D); and

(vi) petitioner has not previously collected a judgment or settlement in a prior or pending civil action, § 300aa–11(c)(1)(E).

**2.** Prior to the hearing, on May 26, 1989, the Department of Justice withdrew as counsel.

Consistent with the foregoing, the court further observes that the Special Master correctly found that the Secretary concedes that the vaccine was administered to the deceased on October 9, 1985, in the United States and that death ensued in the early hours on October 13, 1985. Court Ex. 1. More importantly, the Special Master found that the record is void of any creditable evidence demonstrating by a preponderance that death may be reasonably attributable to some factor unrelated to the administration of the vaccine.

On December 26, 1989, following the Report and Recommendation of the Special Master, the petitioner filed his objections. Therein, the objections simply raised two minor issues—(i) the propriety of disallowing the $934.00 round trip travel expense to Washington, D.C. for one of the parents of the deceased; and (ii) a claim for *additional* expenses incurred in preparation of the objections filed (*i.e.*, 3.5 hours at $125 per hour or $450.00). These issues will be discussed, *infra.*

Thereafter, on January 10, 1990, there was filed Respondent's Response To Petitioner's Objections To The Report and Recommendation of the Special Master. Inasmuch as the only adjustments the Special Master made to the amounts claimed by petitioner were the reduction in Mr. Preiser's hourly rate from $250 to $225 per hour and the disallowance of $934 for travel expenses, as to which petitioner objected, the respondent opined that said adjustments were proper and within the Special Master's discretion. Consequently, it was *respondent's* conclusion that the "judgment should be entered based on the thorough review of the case by the Special Master."

Against this background, the threshold issues raised by the foregoing facts and circumstances are—

(i) whether the petitioner has demonstrated by a preponderance of the evidence that the deceased suffered an encephalopathy or shock collapse and resulting death due to the administration of the DPT vaccine;

Thus, it filed no further pleadings, nor did it participate in any further proceedings.

(ii) if so, whether a preponderance of the evidence establishes that death was due to factors unrelated to the administration of the vaccine; and

(iii) whether the attorney fees claimed are established as reasonable under all of the circumstances.

*Discussion*

A. *Death Benefit Award*

■ We begin by addressing two threshold issues—first, whether proof of all of the fundamental elements have been met by a preponderance of evidence to establish petitioner's entitlement to a $250,000 death benefit, *see* § 300aa–15(a)(2), and, secondly, whether the claimed and recommended allowed attorney fees and costs are reasonable and duly substantiated within the contemplation of the statute, § 300aa–15(e).

With respect to the initial issue, our review of the record satisfies this court that the petitioner proved each of the indispensable elements under the Program by the requisite quantum of proof. Additionally, we agree with the Special Master that the record fails to establish by a preponderance of the evidence that the deceased's death was caused by factors unrelated to the administration of the vaccine administered in this case. Consequently, we incorporate herein by reference and adopt the attached Report of the Special Master *only* with respect to the factual findings and conclusions of law on the merits regarding entitlement to the death benefit. Given the foregoing, we hold that petitioner is entitled to an award of $250,000 in statutory compensation pursuant to 42 U.S.C. § 300aa–15(a)(2) (West Supp.1989).

B. *Attorney Fees and Other Costs*

Section 300aa–15(e) of Title 42 U.S.C. provides in pertinent parts under subparagraph (1) that:

The judgment of the United States Claims Court on a petition filed under section 300aa–11 of this title awarding compensation shall include an amount to cover—

(A) reasonable attorneys' fees, and

(B) other costs....

Under that section, the petitioner claimed, and the Special Master recommended, the following attorney fees and costs:

| Item | Claimed by Petitioner | Special Master's Recommendation |
|------|-----------------------|---------------------------------|
| Attorney fees | $16,865.00 | $16,490.00 |
| Costs | 8,808.65[3] | 7,874.65 |
| | $25,673.65 | $24,364.65. |

In addition, petitioner asserted in his December 26, 1989 Objections To The Report And Recommendation of the Special Master entitlement to supplemental attorney fees (3.5 hours at $125.00 per hour = $450) for time spent in preparing objections to the Special Master's Report.

In determining the recommended allowable amount of attorney fees, $16,865.00, the Special Master followed the "lodestar" method. *See Lolley v. United States*, 18 Cl.Ct. 498 (1989). In *Martin v. United States*, 12 Cl.Ct. 223, 227 (1987), Senior Judge Kenneth R. Harkins stated that:

**3.** In the November 7, 1989 fee application, $5,140.47 was initially claimed as costs. By a letter dated November 15, 1989, to the Special Master, counsel claimed an additional $250.00 for consulting for Dr. William Cox for a total of $5,390.47. However, the computer print-out attached to the fee application discloses that said $250 for Dr. Cox is included in the $5,140.47 which was allowed. *See* Exhibit 5 attached to said application. Subsequently, in a submission filed on December 4, 1989, additional costs contained in a computer print-out were claimed in the amount of $3,668.18. This amount when added to the initially claimed costs aggregates $8,808.65 ($5,140.47 + 3,668.18).

The starting point, the "lodestar," for determining the amount of a reasonable fee is the number of hours reasonably expended multiplied by a reasonable hourly rate. The amount of the fee is determined by the facts of each case, and the lodestar figure is subject to adjustment upward or downward through application of other factors.... Factors that bear upon adjustment to the lodestar figure include those identified in *Johnson v. Georgia Highway Express*, 488 F.2d 714, 717–719 (5th Cir.1974), as follows: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

■ Against this background, we view the foregoing as establishing an imperative that the party submitting the application for an award of attorney fees *must* present probative evidence of the hours worked at the rates claimed. Where creditable supporting documentation is inadequate or wanting, the award may be reduced accordingly. In that connection, *Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983), teaches that a party *must* keep records in sufficient detail so as to enable a neutral judge to make a fair evaluation of the time spent, the nature and the need for the service, and the reasonableness of the fee allowed. To be probative, the documentary evidence proffered in support of the fee petition must, therefore, consist of contemporaneous time records prepared in the ordinary course of business. *See Grendel's Den v. Larkin*, 749 F.2d 945, 952 (1st Cir.1984) (the failure to document time might merit disallowance or at least drastic reduction of a fee award).

■ With respect to our evaluation of the claimed amounts for attorney fees, this court's analysis will, therefore, undertake a two-prong focus in applying the "lodestar" method: (i) whether the applicants maintained adequate contemporaneous records to support the *hours* claimed for the services provided, and (ii) whether the claimed *number of hours* and *rate* charged for each attorney's services, under *all* the facts and circumstances, were reasonable. As to the claimed costs, the dispositive issue there is simply whether the records submitted substantiate the same by a preponderance of the evidence.

The following schedule summarizes the hours, the rates, and the amounts charged by each attorney as claimed by petitioner and as allowed by the Special Master:

| Hours Allowed Special Master | Servicing Attorney | Rate Claimed | Rate Allowed Spec. Master | Special Master Allowed |
|---|---|---|---|---|
| 14.6 | A. Colantoni | $250 | $250 | $ 3,650 |
| 15.0 | M. Preiser | 250 | 225 | 3,375 |
| 9.1 | C. Paulson | 150 | 150 | 1,365 |
| 10.0 | B. Kiselstein | 150 | 150 | 1,500 |
| 52.8 | K. Moll | 125 | 125 | 6,600 |
| 101.5 | | | Allowed by Special Master | $16,490. |

Each line item will be succinctly discussed seriatim as to the sufficiency of the proof.

*Anthony M. Colantoni*

■ A computer print-out attached to petitioner's Objections To The Report and

Recommendation of the Special Master details 14.6 hours of legal services performed by Mr. Colantoni for the petitioner between the dates December 1, 1988 and September 22, 1989. Exhibit 3. Said record contains a line description of the work performed on *each* of the 28 performance dates. The rate of $250 an hour is also recorded as the charge for *each* descriptive service for a total fee claim of $3,650. The court finds that the *hours* charged for the indicated services are adequately substantiated by efficacious records as 14.6 hours for Mr. Colantoni. We therefore adopt the recommended finding of the Special Master regarding such hours and services performed.

The foregoing finding does not end the analysis with respect to the proof of legal fees awardable to Mr. Colantoni. The critical issue now is—whether the $250 charge per hour for each dated service provided is reasonable under the totality of the circumstances of this case. To obviate redundancy, the court will discuss the reasonableness of the hourly rate charged by *all* five attorneys to petitioner under the topical heading Hourly Rate Charged—Reasonableness, *infra*.

*Martin N. Preiser*

With respect to Mr. Preiser, the fee application also claimed 15 hours of legal services at $250 per hour or $3,750. In proof of the foregoing claim, a similar computer print-out sheet, attached to the November 7, 1989 Application for Attorneys' Fees and Other Costs, discloses .75 hours of legal services at the rate of $150 per hour were provided to the petitioner. Additionally, there was attached to a December 4, 1989 supplemental submission, consisting of affidavits, a typewritten *undated* statement captioned "Monteverdi" and signed by Mr. Martin N. Preiser. This *undated* statement contained eight *undated* descriptive line activities allegedly performed by Mr. Preiser with specific time amounts allocated to each. The aggregate time allocated to the eight alleged descriptive services totalled 14.7 hours. Thus, the time detailed on the two foregoing documents totaled 15.45 hours (14.7 plus .75) or .45 *more* hours than claimed in the fee application.

■ It is clear that the .75 hours claimed on the computer print-out are sufficiently substantiated by contemporaneous records and, accordingly, are allowed. On the other hand, the court has substantial misgivings as to the legal sufficiency of the proof (undated typewritten statement) respecting the claimed 14.7 hours. This is so not only because there is no date indicating when said document was prepared but there also are no dates on each line item denoting when the alleged services were performed. Consequently, we are not satisfied that the alleged hours are proven by creditable documentary evidence consisting of *contemporaneous* records. All that is offered here, under these circumstances, in proof of the 14.7 claimed hours is a *post litem motam* statement, undated as to the time the statement was prepared and also undated as to the time of performance of the alleged services. Moreover, such circumstance impedes the ability of the court to make a fair and reasonable evaluation of the underlying facts averred in support of the fee claims. Here said document falls far short of a contemporaneous record maintained in the ordinary course of an attorney's business. Additionally, no further probative evidence was adduced to establish proof of the 14.7 claimed hours. Given such, this court is inclined to find that the evidence is thoroughly wanting with respect to proving the 14.7 claimed hours. We are so inclined because we find that petitioner's burden is substantial and may not be met by the cavalier submission of a hospitable, self-serving, undated piece of paper.

■ In short, counsel should understand that § 300aa–15(e) does not give attorneys carte blanche to any undocumented amount of attorney fees merely by claiming them. To be entitled to fees under that section, the hours as well as the rate *must* be appropriately documented. Stated differently, we believe that the same modicum of statutory "generosity" applicable to the merits of these vaccine cases is *not* applicable to the determination of reasonable attorney fees. Thus, we hold, as to attorney

fees, that the traditional method of proof is required to satisfy the "reasonable" requirement.

■ While we are resolute in such holding, given the totality of the circumstances, *i.e.*, because of a new Act, we will not apply such exacting standards, in the instant case only, in determining the sufficiency of proof relative to the number of hours claimed. However, we emphasize that henceforth counsel shall clearly understand that proof of hours expended for legal services must be established by contemporaneous time records. Failure to properly document the hours will result in appropriate and substantial adjustments. In the instant case only, for the foregoing reasons, the court allows 15.45 claimed hours.

The reasonableness of the hourly rate charged ($150) and claimed ($250) by Mr. Preiser will be discussed, *infra*.

### Charles Paulson

■ Attached to the November 7, 1989 Application for Attorneys' Fees and Other Costs is an *unsigned* October 12, 1989 statement for professional services, allegedly rendered in subject matter, on the stationery of Charles Paulson, attorney at law. Thereon are included six (6) dated line items for services performed and the hours spent noted on each. The total time allegedly expended to perform said services were 9.1 hours. The court observes that no hourly rate is stated on said statement by the service provider, Mr. Paulson. A rate of $150 per hour is claimed, however, in the fee application for said services. We nevertheless view the statement as tantamount to an invoice demanding payment for services rendered, executed, and maintained in the regular course of an attorney's business. Consequently, we find it to be probative of the performance of 9.1 hours of claimed legal services to petitioner.

The reasonableness of the $150 hourly rate claimed by Mr. Paulson is discussed *infra*.

### Bruce Kiselstein

■ Mr. Kiselstein is also a member of the law firm representing the petitioner, McDowell and Colantoni, Ltd. In support of his alleged 10 hours expended in providing legal services to petitioner, there was also submitted an undated typewritten statement captioned "Monteverdi." This undated statement contained four (4) line items ostensibly delineating the legal services performed with the number of hours noted to perform each. There are no dates on any of the four line items indicating the periods of time such services were performed. Moreover, said statement does not contain an hourly rate charged for performing any of the line items.

The court has the identical misgivings as to the legal efficacy of this document, *in proof* of the 10 claimed hours, as it did for the 14.7 claimed hours of Mr. Preiser. *See supra.* That is, said document is not a contemporaneous record made and maintained in the ordinary course of business and, therefore, is not creditable proof of the 10 claimed hours. Similar to Mr. Preiser's statement, it is also a *post litem motam undated* statement. Since no additional documentary evidence was proffered to prove the alleged 10 hours, as with Mr. Preiser, this document is also totally deficient and cannot carry petitioner's burden. Nevertheless, for the identical reasons expressed, *supra*, the court will allow the 10 hours claimed for Mr. Kiselstein. The reasonableness of the $150 hourly rate claimed by Mr. Kiselstein is discussed *infra*.

### Kenneth B. Moll

■ Finally, the fee application filed claimed that Mr. Moll, also an associate in the firm of McDowell and Colantoni, Ltd., provided 52.8 hours of legal services to the petitioner. Further, the hourly rate claimed was $125. In support of the 52.8 hours of services provided, two documents were proffered to support the claim. The *first* was a computer print-out reflecting details of a work-in-process report on petitioner's claim dated November 2, 1989. This print-out was attached to the November 7, 1989 application for attorney fees. Moreover, said print-out contained 13 dated

line items depicting 42.8 hours of descriptive services provided by Mr. Moll between the dates of September 22, 1989 and October 3, 1989. The hourly rate indicated for each line item of service was $90.00.

Surprisingly, also received in proof of the same 52.8 hours of legal services provided by Mr. Moll was a similar computer printout, which was attached to the petitioner's December 20, 1989 Objections to the Report and Recommendation of the Special Master. That computer statement contained the same 13 *dated* line items denoting 42.8 hours of legal services provided by Mr. Moll as noted above, *plus* 23 additional dated line items. The aggregate 36 line items of services rendered by Mr. Moll total 52.8 hours of descriptive service. Contrary to the initial November 2 statement, which charged a rate of $90 per hour for each of the 13 line items, a second statement, dated December 20, 1989, charged *$125* per hour for the identical previously referred to 13 line items and also for the additional 23 services provided. The computer print-out dated December 20,

1989 is sufficiently probative of the 52.8 hours of legal services claimed by Mr. Moll, and we so find. However, the reasonableness of the various hourly charges for the identical services performed, $90 an hour and $125 an hour, is discussed *infra.*

In summary, the foregoing fee application discloses that the five counsel claimed to have performed 101.5 hours of legal services on behalf of the petitioner. However, our analysis of the evidence discloses that the proof is creditable and probative *only* as to 77.25 hours for the reasons stated, *supra.* Notwithstanding the shortcomings as enumerated with respect to the proof of the hours of Mr. Preiser and Mr. Kiselstein, we have allowed them in full for the reasons previously expressed. Therefore, we find that 105.45 hours of legal services were performed.

*Hourly Rate*

The court will discuss the *reasonableness* of the following hourly dollar rates claimed by *each* of the five referenced attorneys:

| Attorney | Amount Per Record | Amount Per Fee Application |
|---|---|---|
| Anthony M. Colantoni | $250 | $250 |
| Martin N. Preiser | $150 | $250 |
| Charles Paulson | –0– | $150 |
| Bruce Kiselstein | –0– | $150 |
| Kenneth B. Moll | $90 and $125 | $125. |

The contemporaneous record submitted in support of Mr. Colantoni's hourly rate reflects a $250 hourly rate charge consistent with the amount claimed in the fee application. Contemporaneous records in support of Mr. Preiser reflect .75 hours charged at a rate of $150 per hour, whereas the fee application sought $250 per hour for legal services. The balance of the 14.7 hours claimed for Mr. Preiser set forth on a typewritten sheet of paper *failed* to reflect an hourly rate. The documentary evidence establishing Mr. Paulson's 9.1 hours of legal services also fails to reflect an hourly rate. However, the fee application seeks $150 per hour. Similarly, the type-

written statement reflecting the 10 hours claimed by Mr. Kiselstein does not assert an hourly rate, while the fee application seeks $150 per hour. Finally, the contemporaneous records establishing Mr. Moll's 52.8 hours contain an hourly charge of $125 per hour for each of the full 52.8 hours while another document contains a charge of $90 per hour for 42.8 hours of the same 52.8 hours.

The court is mindful of a strikingly similar case involving the death of an infant resulting from the administration of a DPT shot in which the fee application of counsel sought $290.00 per hour for legal services. In that case, *Pusateri, as legal representa-*

*tive of the Estate of Stephen J. Pusateri II, deceased v. Secretary of the Department of Health and Human Services,* 18 Cl.Ct. 828 (1989), the petitioner was there represented by the same counsel (Mr. Anthony M. Colantoni) who is representing petitioner in subject case. Senior Judge Thomas J. Lydon in an exceedingly well-reasoned opinion stated that:

> The court does not feel that $75 per hour is inadequate or unreasonable in the context of the record in this case as it relates to the establishment of liability and to the establishment of a reasonable hourly rate for services rendered....
>
> \* \* \* \* \* \*
>
> Finally, the court feels that adequate and competent attorney representation for vaccine claimants is available in the Chicago area at the $75 per hour rate.[4]

*Pusateri,* at 833.

In that case, Judge Lydon noted that in enacting the Vaccine Program, Congress failed to define or give any guidance as to what they meant by "reasonable attorney's fees" under § 300aa–15(e). He further observed, and rightly so, that legislative history indicates that Congress did *not* intend that vaccine legal fees would be large. Moreover, it was contemplated that they would be *less* than legal fees in general negligence cases. Support for this position was found by Judge Lydon in a 1986 House Report wherein he noted that *Congress compared the black lung disease compensation program to the vaccine program and concluded that since attorneys' fees under the former were "significantly lower* than in routine civil litigation, *the same would likely hold true for the Vaccine Program." Pusateri,* at 829 (emphasis added).

Further, and because of the want of legislative guidance, Judge Lydon suggested

in *Pusateri* that analogies should therefore be drawn from other remedial legislation containing attorneys' fee provisions such as the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412 (1982). As a guidepost, it was urged that in the absence of creditable proof of entitlement to a higher hourly rate the EAJA rate of $75 per hour is, as a starting point, one of a number of rational bases for determining a *reasonable* attorney fee hourly rate in vaccine cases. The court in *Pusateri* reasoned that:

> Support for this approach can be found by drawing upon Supreme Court and lower federal court decisions analyzing reasonable attorney's fees provisions in a variety of remedial legislation. For example, in construing the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988 (Supp. V 1981), the Supreme Court observed that Congress believed *a reasonable attorney's fee is one that is " 'adequate to attract competent counsel, but ... [that does] not produce windfalls to attorneys.' " Blum, supra,* 465 U.S. at 897 (quoting S.Rep. No. 1011, 94th Cong., 2d Sess. 6 (1976), *reprinted in* 1976 U.S.CODE CONG. & ADMIN. NEWS 5909, 5913).

*Pusateri,* at 830 (emphasis added). Citing *Coulter v. State of Tennessee,* 805 F.2d 146, 149 (6th Cir.1986), a civil rights case involving an extensive analysis of reasonable attorneys' fees, *Pusateri* emphasized that "reasonable" attorneys' fees " 'are different from the prices charged to well-to-do clients by the most noted lawyers and renowned firms in a region.' "[5] *Pusateri,* at 830.

It is axiomatic to note that the *burden* is on the fee applicant to prove by *competent* and probative evidence its entitlement to the hourly rate claimed as a

---

4. Judge Lydon in *Pusateri,* at 833, note 8, further observes that many competent and experienced lawyers from the Chicago area practice in this court. Some of their cases are most complex and difficult, more so than subject case. Moreover, under the EAJA, their award, if the government's position is not substantially justified, is generally limited to $75 an hour unless they can justify a higher fee based on certain factors.

5. It also cited to a fee statute under the Clean Air Act where the Supreme Court noted that such an act was "not designed as a form of economic relief to improve the financial lot of attorneys, nor were they intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986).

reasonable fee. In support and justification for allowance of the claimed fee rates averred in the fee application, *i.e.*, $250, $150, and $125 per hour, all that was proffered was a hospitable affidavit by a professional acquaintance of each of the five attorneys in which it was blandly averred that:

(i) the affiants are licensed in the State of Illinois and practice in the Chicago area;

(ii) their practice (*i.e.*, four of the five) involves personal injury, negligence, malpractice, vaccine, and other personal injury cases;

(iii) they are familiar with the firm of McDowell and Colantoni, their reputation, skill, and experience, and the practice of Messrs. Colantoni, Preiser, Kiselstein, and Moll;

(iv) DPT litigation requires specialized skill, knowledge, and expertise in the areas of science, biology, microbiology, immunology, vaccinology, and medicine;

(v) said expertise is not generally possessed by experienced counsel;

(vi) Messrs. Colantoni, Preiser, Kiselstein, and Moll have such knowledge and expertise; and

(vii) a reasonable hourly attorney fee for the "specialized experience, skill and knowledge of"—

—Mr. Colantoni is $290,

—Mr. Preiser is $290,

—Mr. Kiselstein is $150, and

—Mr. Moll is $125.

With respect to proof in support of the hourly rate for Mr. Paulson, whose office is located in Portland, Oregon, an attorney licensed in the State of Oregon, and practicing in Portland, Elden M. Rosenthal submitted an affidavit. Said affidavit, similar in style to the four Illinois affiants, blandly and conclusorily averred that:

(i) the affiant has practiced law for 17 years in Portland and for the past 10 years he has handled medical malpractice and defective products claims;

(ii) he is familiar with Mr. Paulson's reputation, skill, and experience in representing injured persons;

(iii) he is familiar with the *"normal hourly rates charged by varying practitioners in Portland, Oregon"* (emphasis added); and

(iv) an hourly rate of $150 for the representation of persons claiming injury from DPT vaccine is reasonable for "the expertise and experience of Mr. Paulson relative to the range of normal and usual hourly rates for experienced trial counsel in the Portland area."

In fact, except for the name of each affiant, the five named attorneys providing the service, the rates and a few other innocuous matters, each affidavit was markedly similar. That is to say, no creditable showing was made through *any* of the affiants—establishing unusual facts showing that extraordinary talents were required and that such services were *actually* provided in litigating this case which would warrant the high fees claimed. Rather, the irrefutable evidence requires a finding to the contrary. This conclusion is patently clear for the reason that—(i) to establish the requisite liability under the Program a reduced/minimum standard of proof is required; (ii) under the Program there is no necessity to prove negligence in the traditional manner in tort cases; (iii) proof problems were minuscule if not nonexistent in this case; (iv) the case is neither complex nor vexing in fact or in law in that the hearing transcript consisted of only 96 pages; thus, the time required for the hearing was probably less than three hours; (v) there was no briefing of the issues; (vi) the trial proceedings were nonadversarial in that the respondent's counsel withdrew and did not cross-examine any witnesses or adduce any evidence, except the autopsy report;[6] and (vii) upon the perfunctory establishment of certain basic

---

6. Charles R. Gross, on January 9, 1989, entered an appearance for respondent, but withdrew his appearance prior to the hearing scheduled before Special Master Gerard in this case. On January 10, 1990, Michael P. Milmoe entered his appearance for respondent in this case. From the time Mr. Gross withdrew from the case on May 26, 1989, to the time Mr. Milmoe entered an appearance, respondent was not represented.

facts, there is a rebuttable presumption of causation and resulting liability under the Program. In fact, the record shows that the respondent, while not participating in the hearing, filed a memorandum *agreeing* with the highly favorable Special Master's Report with minor exceptions.

This court, therefore, is constrained to find, as in *Pusateri,* that it strains credulity to contend, on the facts here, that the five attorneys' services warrant allowance of the high fee rates claimed. This is so because we are not impressed with the highly generalized and conclusory information and belief affidavits submitted by professional acquaintances (Messrs. Glenn, Tutt, Rosenthal, Zenner, and Upah) posturing a wide range of hourly rates as reasonable within the contemplation of the Vaccine Act. *Cf. National Ass'n of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1325 (D.C.Cir.1982). These affiants contend that the five attorneys' claimed fees are *reasonable* solely because of their "specialized experience, skill, and knowledge." *See* affidavits filed December 4, 1989. Nowhere in said affidavits do the affiants aver that they are familiar with the operative facts of this case or that they have read the record or have "eye ball" knowledge with regard to the proceedings, including the time it took to conduct the hearing.

Consequently, we thoroughly agree that, in the absence of a statutory standard, the analysis in *Pusateri* is clearly an imminently rational basis for utilizing the $75 EAJA rate as the *floor* for determining a reasonable fee in Vaccine Injury Compensation Program cases. Thus, to be entitled to a higher hourly rate, the movant *must* demonstrably carry his burden by a preponderance of the evidence, and conclusory and hospitable affidavits will not *ipso facto* make the required *prima facie* showing. In short, the burden is real, and while the proof is somewhat relaxed in establishing liability on the merits, there is no proof that Congress similarly intended that a relaxed quantum of proof be applied to establish "reasonable attorney's fees."

Since Judge Lydon found that $75 per hour was "reasonable" in *Pusateri,* due solely to a *failure of proof* of entitlement to a higher rate, and the facts in the case at bar substantially mirror that case, including the *same* lead attorney practicing in the metropolitan area of Chicago, this court can find no rational basis on this record to increase the hourly rate above $75 for any of the attorneys. For the foregoing reasons, we find that $75 per hour, *on this record,* is fair and reasonable. Consequently, we are constrained to reject the Special Master's findings regarding reasonable hourly fee rates.

Premised on the foregoing analysis, the following chart summarizes our findings regarding attorneys' fees:

| Hours Allowed | Attorneys | Allowed Hourly Rate | Amount |
|---|---|---|---|
| 14.6 | Anthony M. Colantoni | $75 | $1,095.00 |
| 15.45 | Martin N. Preiser | 75 | 1,158.75 |
| 9.1 | Charles Paulson | 75 | 682.50 |
| 10.0 | Bruce Kiselstein | 75 | 750.00 |
| 52.8 | Kenneth B. Moll | 75 | 3,960.00 |
| 3.5 | Preparation of objections | 75 | 262.50 |
| 105.45 | | | $7,908.75. |

Petitioner's costs allowed are summarized as follows:

| Item | Amount |
| --- | --- |
| Costs allowed by Special Master | $7,874.65 |
| Proper cost (travel expense) disallowed by Special Master—allowed | 934.00 |
| Total costs allowed | $8,808.65. |

*Conclusion*

Consistent with the foregoing, we award a death benefit of $250,000.00, attorneys' fees in the amount of $7,908.75, and costs of $8,808.65. The Clerk is directed to enter judgment in the amount of $266,717.40, for petitioner in favor of the Estate of Thomas Monteverdi. No additional costs.

IT IS SO ORDERED.

REPORT AND RECOMMENDATION [1]

GERARD, Special Master.

On behalf of his deceased son, Thomas A. Monteverdi (hereafter "Tommy"), petitioner filed this application for compensation under the National Childhood Vaccine Injury Act of 1986 [2] (hereafter the "Vaccine Act" or the "Act"). The petitioner claims that as a direct result of the administration of a DPT [3] vaccination, Tommy suffered an encephalopathy and shock-collapse or hypotonic-hyporesponsive collapse (hereafter "HHC" or "shock collapse"), causing his death. On behalf of his estate, petitioner seeks an award of $250,000 for Tommy's death plus $16,865 as reasonable attorneys' fees and $8,808.65 for costs incurred.

Pursuant to § 300aa–12(c)(2) and Vaccine Rule 18, and based upon all the credible evidence in the record, the undersigned recommends that the court award petitioner compensation in the amount of $250,000. Based upon the statements submitted by petitioner's counsel, the undersigned recommends that the court's judgment include the sum of $16,490 for reasonable attorneys' fees and $7,874.65 as reimbursement for the costs incurred in the prosecution of this petition and a prior civil action. Judgment should be rendered for petitioner in the amount of $274,364.65.

BACKGROUND

On December 23, 1988, petitioner filed his petition for compensation under the Act. Charles R. Gross, an attorney with the United States Department of Justice, filed an appearance on behalf of the respondent, the Secretary of Health and Human Services (hereafter "Secretary"). The Secretary's answer was filed on February 3, 1989. On May 16, 1989, upon joint motion of the parties, this proceeding was suspended for ninety days due to the medical condition of petitioner's counsel. On May 26, 1989, the Secretary's counsel formally withdrew his appearance. He never filed any other pleadings or participated in any other proceedings in this matter.

The hearing was held on September 29, 1989, in Washington, D.C. Theresa Monteverdi (Tommy's mother) and Dr. Mark Robin Geier appeared as witnesses in support of the petition. Nine exhibits were offered by the petitioner and admitted into evidence. In addition, a medical report pre-

---

**1.** This report may contain information that may not be disclosed to a non-party. *See* 42 U.S.C. § 300aa–12(c)(2) (Supp. V 1987). Accordingly, within fourteen (14) days after the date of this report, the parties shall designate any material subject to § 300aa–12 and such designated material will be deleted for public access. If on review of this report, there are no objections filed within the fourteen (14) day period, then it

shall be deemed that there is no material subject to § 300aa–12.

**2.** Pub.L. No. 99–660, enacted November 14, 1986, amended by Pub.L. No. 100–203 (1987) and Pub.L. No. 100–360 (1988) (codified at 42 U.S.C. §§ 300aa–1 to 300aa–34 (Supp. V 1987)).

**3.** Diphtheria and tetanus toxoids with pertussis vaccine.

pared by the Secretary in this case was admitted as an exhibit of the court. The petitioner did not object to its entry, but neither did he endorse the statements made therein. Although notified of the hearing, the Secretary failed to appear or offer any evidence in the above-captioned matter.

After the hearing, petitioner's counsel was granted four successive suspensions totally 49 days to complete his attorneys' fee application.

The Secretary chose neither to actively defend this action nor to illuminate the petitioner or the court about the factual or legal bases of his opposition to compensation. Thus whatever merit may have existed in his case was not formally presented. However, as the Secretary's medical report was admitted on the court's own motion, without objection, its contents are in evidence and will be considered.

### ISSUES

In assessing whether the petitioner may receive compensation under the Vaccine Act for Tommy's death, this court must determine (1) whether the petitioner has demonstrated by a preponderance of the evidence that Tommy suffered an encephalopathy or shock collapse due to the administration of a DPT vaccine. Assuming petitioner satisfies this threshold burden, the court must next inquire (2) whether there is a preponderance of the evidence establishing that Tommy's death was due to factors unrelated to the administration of the vaccine in question. Regardless of whether or not petitioner prevails on the merits, this court must also decide (3) whether coun-

sel's representation in this matter warrants an award of attorney fees.

### FINDINGS OF FACT

The following uncontroverted facts are supported by the record and adopted by the undersigned:

Tommy was born on June 13, 1985, the first child of the petitioner, Anthony Monteverdi and his wife, Theresa Monteverdi. He was born at the Beaverton Clinic of Kaiser Permanente after a full term gestation and was the product of a normal, spontaneous vaginal delivery. At birth, Tommy weighed eight pounds and measured twenty and one-half inches in length. His Apgar scores [4] were eight and nine, respectively.[5] His general appearance was described by the delivery nurse as "color pink; cry good; tone, reflexes normal." [6] In light of their good health, both Tommy and his mother were discharged approximately twelve hours after delivery as part of Kaiser's early discharge program.[7]

Tommy was examined on three occasions by Dr. Tochen, his pediatrician, and found to be a well child.[8] The doctor's only concern was that Tommy was gaining too much weight, and he asked Mrs. Monteverdi to monitor Tommy's diet.[9] Other than a slight bout of colic and some early signs of jaundice, from birth until four months of age, Tommy essentially was a very healthy, happy baby, who ate and slept on a regular schedule.[10]

Tommy reached all of his developmental milestones normally. In his first month, he was alert and began to lift his head.[11] In his second through third months, he smiled, lay on his stomach and held his head up, followed objects with his eyes, and recog-

---

4. An Apgar test measures heart rate, respiration, muscle tone, responsiveness to stimulation, and skin color. Generally two tests are conducted at exactly one minute and five minutes after birth. A perfect score is ten. *The Merck Manual of Diagnosis and Therapy* at 986 (13th ed. 1977) (hereafter "*Merck* at ____").

5. Transcript of hearing held on September 29, 1989 at 12, 17 (hereafter cited as "tr. at ____"); hearing exhibit 2 at 1–2, 5; exhibit 3 at 1–2, 4, 18 (hereafter cited as "ex. ____ at ____").

6. Ex. 3 at 4.

7. Tr. at 17; ex. 3 at 6, 11.

8. These well-baby visits occurred on June 26, August 8, and October 9, 1985. Tr. at 21–22; ex. 4 at 6–7.

9. Tr. at 23–24.

10. Tr. at 23.

11. Tr. at 20.

nized his parents' voices.[12]

At his August 8, 1985 well-baby check-up, Tommy was administered his first DPT inoculation.[13] He was given an oral polio vaccination at the same visit. That evening, Tommy ran a fever and Mrs. Monteverdi gave him Tylenol as instructed by Dr. Tochen. She noticed no other unusual reactions; Tommy went to sleep at his normal bedtime, slept his regular hours, and appeared fine in the morning.[14]

On September 2, 1985, Mrs. Monteverdi took Tommy to the hospital for what she believed to be seizure activity.[15] Mrs. Monteverdi described the incident to the emergency room personnel as lasting five to ten seconds directly after Tommy's feeding.[16] As she recalls, Tommy was

> ... drifting off to sleep in my arms and he was very relaxed and he was drinking a bottle and he wasn't sucking on it anymore so, I knew that he was almost asleep. And, he started shaking in a strange way and I became alarmed.[17]

Afterwards, he had an approximately five to ten minute episode of crying. There was no "fever, emesis,[18] [or] unusual somnolence," nor any family history of seizure activity.[19] At the hospital, Tommy was found "alert, active, and apparently happy." [20] The emergency room physician concluded that the suspected seizure was probably in fact a startle reaction [21] and instructed Mrs. Monteverdi to have a follow-up visit with a clinic doctor.[22]

The next day, Tommy was seen by Dr. Massengale, who noted that the child had "excellent past health." [23] Dr. Massengale observed further that he "doubt[ed] real seizure" activity. The doctor informed the Monteverdi family that he too believed Tommy had a startle reaction.[24] He prescribed no medication and simply advised the family to watch Tommy for possible future episodes.[25]

From the September 2 incident until October 9, 1985, the date of Tommy's third well-baby visit, Tommy continued to progress.[26] According to Mrs. Monteverdi,

> His favorite play was to lie on his stomach and he pushed up real well with his arms and he looked at his toys and reached for his toys. And, was able to actually grasp and hold some of [them].... He smiled and he laughed a lot and he interacted with us real well.... He was able to crawl on his stomach around in a circle. And, he cooed a lot.[27]

In addition, Tommy slept throughout the night, approximately ten to twelve hours, and was eating quite well.[28]

On October 9, 1985, at the age of four months, Tommy received his second DPT shot.[29] The shot was administered in Portland, Oregon by Dr. Tochen's nurse.[30] An oral polio vaccine was also given. Dr. Tochen discussed the September 2 emergency room visit with Mrs. Monteverdi, concurred

---

12. Tr. at 22.

13. Tr. at 24; ex. 3 at 6.

14. Tr. at 24–25.

15. Tr. at 26.

16. Ex. 5 at 10.

17. Tr. at 26.

18. Emesis is defined as vomiting. *Dorland's Illustrated Medical Dictionary* at 545 (27th ed. 1988) (hereinafter *"Dorland's"*).

19. Ex. 5 at 11.

20. Ex. 5 at 10.

21. A startle reaction, or normal sleep myoclonus, is a shock-like contraction of a portion of a muscle, an entire muscle, or a group of muscles.

*Dorland's* at 1090. It may occur in infants when they are half asleep or when they hear a noise which surprises them. Tr. at 70.

22. Tr. at 27; ex. 5 at 10.

23. Ex. 5 at 11.

24. Tr. at 29.

25. Ex. 5 at 11.

26. Tr. at 29.

27. Tr. at 30.

28. Tr. at 30–31.

29. Tr. at 31–32; ex. 5 at 1.

30. Tr. at 33.

with the treating physicians that it was a startle reaction, and felt it should not prevent administration of any vaccine.[31]

Approximately four hours after returning from the doctor's office, Tommy again ran a fever; and again, Mrs. Monteverdi gave him some Tylenol. Shortly after the Tylenol was administered, while his mother was playing with him, Tommy began "making some strange noises and acting as though he was having trouble breathing." [32] The noises were "rhythmic grunts, like he was trying to exhale or catch his breath. Then he would catch his breath and kind of cry and then he would do it again." [33] Although Tommy's fever continued throughout the evening, the grunting episode was only of short duration.[34]

On the morning of October 10, 1985, Tommy did not wake up on his own and, after fourteen hours of sleep, his mother had to rouse him. When he finally woke, he was not hungry and seemed lethargic and listless. As the day wore on, Tommy's uncharacteristic behavior continued: he did not want to play, he did not eat well, he did not cry, and he slept a lot—taking many naps. Mrs. Monteverdi put him down at his normal bedtime.[35]

The next day, October 11, Tommy again slept fourteen hours and had to be aroused from sleep. Although he did not appear hungry or cry to be fed, Mrs. Monteverdi gave him his morning feeding. He continued to sleep and missed an entire feeding. Mrs. Monteverdi, who took Tommy out for the day with her sister, recalls putting her child in the car seat:

> ... he was awake and he was very, very pale and limp. And he was looking at me and his eyes were real wide open, but he was ... staring in a strange way, ...

past me or through me. And I remember thinking there was no spark in his eyes and he really didn't seem to know me.[36]

At home, he still showed no interest in eating, never cried, was listless and sleepy. At 9:00 p.m., Mrs. Monteverdi put Tommy to bed.

Although Tommy again had to be awakened, his behavior on the day of October 12, 1985 differed from the two previous days. He still did not eat well, but on this day, he seemed discontent and irritable. He cried, whimpered and fussed. Mrs. Monteverdi held him a lot. In the afternoon, when his mother lay him down to change his diaper, Tommy screamed very loudly, in a strange high-pitched scream that Mrs. Monteverdi had never heard before. She "picked him up immediately without changing his diaper because [she] thought something had hurt him." [37] He continued to cry like that off and on for about three hours, and nothing Mrs. Monteverdi tried to do seemed to console him.[38] When Mr. Monteverdi came home, his wife told him that Tommy seemed "panicked" and "so scared." [39] Because she and Tommy were tired from the day, Mrs. Monteverdi lay him to rest early that evening, between 8:00 and 8:30 p.m.

In the morning, both parents went to wake Tommy up, and from across the room, Mr. Monteverdi could see that something was wrong. Mrs. Monteverdi walked over to touch him and then called 911, who advised that she try infant CPR. Mr. Monteverdi attempted to resuscitate his son, but Tommy was dead.[40] The autopsy report lists the time of death between 6:00 and 8:00 a.m.[41]

An autopsy was performed on October 14, 1985. The report lists thymic petechi-

---

31. Tr. at 43.

32. Tr. at 33.

33. *Id.*

34. Tr. at 34.

35. *Id.*

36. Tr. at 35.

37. Tr. at 36.

38. *Id.*

39. Tr. at 37.

40. Tr. at 38.

41. Ex. 6 at 2.

ae[42] and acute vascular congestion of the lungs as anatomic diagnoses. The pathologist who performed the examination noted that the child was administered a DPT shot a few days before death and ran a slight fever.[43] External examination revealed no significant abnormalities. Upon gross examination, the pathologist observed that the brain was of mushy consistency, suggesting anoxic damage.[44] He found no external or congenital abnormalities, and no evidence of traumatic injury.[45] Based upon these findings, he concluded that Sudden Infant Death Syndrome, commonly known as SIDS,[46] was the cause of death.[47] Similarly, upon medical review, the Secretary concluded that Tommy's death was attributable to SIDS.[48]

At the hearing, the petitioner's expert witness, Dr. Mark Robin Geier,[49] strongly challenged the premise that SIDS played any causative role in Tommy's death. Dr. Geier has reviewed all of Tommy's medical, hospital, and autopsy records as well as the statements and testimony of the family members.[50] Based upon his review, Dr. Geier concluded that Tommy was a normal, well child prior to the administration of the DPT shot. Immediately following the shot, he ran a fever, and, in Dr. Geier's opinion, Tommy suffered both an HHC and an encephalopathy within 36 hours after the administration of the DPT vaccine.[51] Dr. Geier believes, to a reasonable degree of medical certainty, that the DPT vaccine in fact caused the HHC and encephalopathy and ultimately, Tommy's death.[52]

## DISCUSSION

The Act requires the petitioner to establish the following elements by a preponderance of the evidence before compensation can be awarded, § 300aa–13(a)(1)(A):

(1) Tommy received a vaccine listed in the Vaccine Injury Table [hereafter "Table"]; § 300aa–11(c)(1)(A), and

(2) the vaccine was administered in the United States; § 300aa–11(c)(1)(B)(i)(I), and

(3) he sustained an injury listed on the Table within the specified time limits, § 300aa–11(c)(1)(C)(i), *or* he sustained an injury set forth in the Table beyond the specified time frame but which was caused by the administration of the vaccine; § 300aa–11(c)(1)(C)(ii)(II), and

(4) he died from the vaccine; § 300aa–11(c)(1)(D), and

(5) petitioner has not previously collected a judgment or settlement in a prior or pending civil action. § 300aa–11(c)(1)(E).

In addition, where as in this instance, petitioner alleges the victim died as a result of the inoculation, the petition must be brought by his legal representative of the deceased's estate. § 300aa–11(b)(1)(A).

Once the petitioner establishes a prima facie case, the burden then shifts to the respondent who must prove by a preponderance of the evidence that the claimed

---

**42.** Thymic petechiae are pinpoint non-raised, perfectly round, purplish red spots caused by intradermal or submucous hemorrhage found on the thymus, a lymphoid organ. *Dorland's* at 1268, 1720.

**43.** Ex. 6 at 2.

**44.** Ex. 6 at 6.

**45.** Ex. 6 at 1, 4.

**46.** "The completely unexpected and unexplained death of an apparently well, or virtually well, infant.... The cause is uncertain." *Merck* at 1049.

**47.** Ex. 6 at 1.

**48.** In addition, although noting possible seizure activity between the administration of the first and second DPT inoculations, the review further found "certainly no reason to suspect that a progressive neurological disorder was present in this child." Ct. ex. 1 at 2.

**49.** Dr. Geier is board certified by the American Board of Medical Genetics. He conducts medical research and has developed a special expertise on the toxic effects of the DPT vaccine. Dr. Geier has exhaustively reviewed and is familiar with the medical and scientific literature on the adverse reactions to DPT. Tr. at 53, 62–63; ex. 8.

**50.** Tr. at 65–66.

**51.** Tr. at 72.

**52.** Tr. at 77.

injury is attributable to some factors unrelated to the vaccine.[53] Such factors may not include "any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness, or condition."[54] Despite the Secretary's absence in these proceedings, and in the interests of effectuating Congress' intent in enacting the Vaccine Act, should petitioner satisfy his burden, this court will nonetheless inquire into the issue of alternative cause, *sua sponte.*

The Vaccine Injury Table lists certain injuries and conditions which, if found to occur within the prescribed period of time, create a rebuttable presumption of causation.[55] In this case, petitioner contends that Tommy suffered an encephalopathy and shock collapse within 3 days of receiving a DPT vaccine and died as a result.[56] Section 300aa–14(a)(I) lists DPT as a covered vaccine. The Table lists a shock collapse or HHC which occurs within three days of the vaccine as a compensable injury.[57] Encephalopathy is also listed.[58] The Secretary concedes that the vaccine was administered to Thomas Monteverdi on October 9, 1985 in the United States (Portland, Oregon) and that Tommy died in the early hours of October 13, 1985.[59] Petitioner has not previously collected a judgment or settlement in a prior or pending civil action.[60] Finally, judicially appointed the personal representative of Tommy's estate, Anthony Monteverdi has the requisite capacity to bring this compensation action.[61]

Since all of the essential jurisdictional facts have been proven, if petitioner establishes that Tommy suffered an encephalopathy or shock collapse in the requisite period, causation is presumptively established. In considering the testimony presented at the hearing, the undersigned found all petitioner's witnesses to be credible and convincing. Upon close examination of the record, there is a preponderance of evidence establishing that Tommy suffered an HHC[62] within three days after the administration of the DPT vaccination.[63]

Dr. Geier clearly states that Tommy suffered an HHC attributable to the October 9, 1985 DPT vaccination.[64] The interpretive aids to the Table, § 300aa–14(b)(1) offers the following guidance:

A shock-collapse or a hypotonic-hyporesponsive collapse may be evidenced by indicia or symptoms such as decrease or loss of muscle tone, paralysis (partial or complete, hemiplegia or hemiparesis, loss of color or turning pale white or blue, unresponsiveness to environmental stimuli, depression of consciousness, loss of consciousness, prolonged sleeping with difficulty arousing, or cardiovascular or respiratory arrest.

Tommy was a normal healthy baby: he was born without complications, discharged from the hospital early, reached his developmental milestones normally, and had no significant illnesses. Within four hours of the DPT vaccination, Tommy ran a fever and suffered an episode of grunting, labored breathing which Dr. Geier characterized as likely an initial anaphylactic

---

53. § 300aa–13(a)(1)(B).

54. § 300aa–13(a)(2)(A).

55. § 300aa–14(a).

56. Petition for Compensation at 2; Petitioner's Prehearing Memo at 2.

57. § 300aa–14(a)(I)(C).

58. § 300aa–14(a)(I)(B).

59. Ct. ex. 1.

60. Tr. at 42. The prior civil action in this case was withdrawn. Ex. 9.

61. Ex. 7.

62. There is also evidence that Thomas suffered an encephalopathy. His mother recalls, "I laid him down to change his diaper and he screamed very loudly and in a high pitched scream that I had never heard before." Tr. at 36. Dr. Geier noted that Tommy had "both a well documented hyporesponsive episode as described in the Act and a somewhat less documented but probable encephalopathy." Tr. at 72. However, since the undersigned finds that Thomas suffered an HHC, the issue of an encephalopathy need not be reached.

63. § 300aa–11(c)(1)(C)(i).

64. Tr. at 71, 74, 77.

shock.[65] For the next three days, Tommy slept more than usual and had to be roused from long periods of sleep. He also cried less than usual, was listless, and did not eat normally, all indicative of diminished response to environmental stimuli. In addition, on October 11, Tommy's body was limp—evidence of decreased muscle tone; he was pale; and he stared in a strange way, clearly a depression of consciousness. Thus, in the three days following the administration of the DPT vaccination, Tommy displayed virtually all of the symptoms described in the Act as evidence of an HHC.

Moreover, Dr. Geier found nothing in the medical records or autopsy report inconsistent with his conclusion that Tommy suffered a shock collapse.[66] According to Dr. Geier, acute vascular congestion, reported in the autopsy, is an end-stage shock. Like thymic petechiae and attendant clotting problems, it is a nonspecific finding which is observed in people who die of a number of causes, is part of the process of dying, and wholly in keeping with a shock collapse.[67] Similarly, the pathological evidence of anoxia, or lack of oxygen, such as the brain's mushy consistency, was also compatible in keeping with the clinical profile of an HHC.[68] Finally, Dr. Geier found no evidence that anything other than a DPT-induced shock collapse caused Tom-

my's death.[69] Since Tommy's shock collapse occurred within the requisite three day time period, the petitioner is entitled to the Table's presumption of causation.

Further, the record does not contain a preponderance of evidence that some other agent caused Tommy's death.[70] The only potential alternative cause suggested by the medical records is SIDS, listed on the autopsy report as the cause of death.[71] In fact, the Secretary's own medical review in this case acknowledges that with the exception of SIDS, there is no evidentiary basis to believe some other agent caused Tommy's death.[72] Plainly put, the Secretary's report is irrelevant insofar as it lists SIDS as an alternative cause and only probative to the extent that it fails to unearth any other potential cause of death.

The Act prohibits this Court from denying compensation where an idiopathic condition is suggested as an alternative cause of Tommy's death. The statute expressly precludes consideration of "any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness, or condition ..."[73] as an alternative cause. As Dr. Geier related, SIDS "means that there is no documented cause. [It is] not a disorder ... [It is] a term used to describe infants that die and we can not identify the cause."[74] SIDS is precisely the type of idiopathic cause precluded from considera-

65. Tr. at 71.

66. Tr. at 74.

67. Tr. at 75–76.

68. Tr. at 91–92.

69. Tr. at 76–77.

70. The burden is not on petitioner to disprove alternative causation. Although the Secretary formally presented no evidence regarding alternative causation, in the interests of completeness, the undersigned has reviewed all the evidence in the record and considered the Secretary's report to determine whether Tommy's injuries could have been due to factors unrelated to the administration of the DPT vaccine.

71. Ex. 6. The alleged seizure incident of September 2, 1985 is of no import. First, all of the medical authorities who examined Tommy at

the time of the episode doubted any seizure activity. Dr. Tochen, who was apprised of the situation, apparently felt it of no significance as he administered the DPT vaccination little more than a month later. Dr. Geier deferred to the opinion of the examining physicians. Similarly, the Secretary's medical report in essence concedes that the question of any prior seizure is speculative. In fact, the only basis for believing the September 2 episode to be anything other than a normal sleep myoclonus was the history taken from Mrs. Monteverdi at the emergency room who thought what she saw was seizure-related. Certainly, one passing observation by someone without medical training does not rise to the level of a preponderance of the evidence.

72. Ct. ex. 1.

73. § 300aa–13(a)(2)(A).

74. Tr. at 78.

tion under the Act.[75] Even assuming SIDS were a relevant consideration, there is evidence in the record that Tommy did not suffer a SIDS death. By definition, there is no precipitating factor in SIDS-related deaths: the victim is a healthy child.[76] The autopsy report documents Tommy's post-inoculation fever.[77] Further, the history as described by Mrs. Monteverdi clearly indicates that Tommy was not exhibiting normal healthy behavior and but "disturbing symptoms" prior to his death.[78] Accordingly, the undersigned concludes that there is insufficient evidence to support a finding that anything unrelated to the DPT vaccination caused Tommy's injuries or death.

For the foregoing reasons, the undersigned finds that petitioner's eligibility for compensation is supported by a preponderance of the evidence. Since the petitioner has navigated past the threshold of entitlement to compensation, Tommy's estate can be awarded the $250,000 death benefit [79] and reasonable attorneys' fees and other costs.[80] As this case is a retroactive one,[81] petitioner's compensation for attorneys' fees and costs is expressly limited to $30,-000.[82]

## ATTORNEYS' FEES AND COSTS

The Act provides that a judgment awarding compensation shall include an amount to cover reasonable attorneys' fees and other costs.[83] Petitioner may also recover attorneys' fees and costs incurred in a prior civil action.[84] There is presently some confusion in the Claims Court over the appropriate method for determining attorneys' fees under the Vaccine Act. Some courts have used the traditional lodestar method to determine the reasonableness of rates; others have looked to the Equal Access to Justice Act [85] (hereinafter "EAJA") and incorporated its $75 [86] per hour rate into the Vaccine Act.[87] After weighing the considerations on either side, this court has decided that the appropriate method for computing attorneys' fees under the Act is the "lodestar" model.[88]

By design, the attorney fee provisions in the Vaccine Act differ substantially from those in EAJA. First, unlike EAJA, the

75. See e.g. Newman v. Secretary of H.H.S., No. 88–17V, slip op. (Cl.Ct. Sept. 29, 1989); Rochester v. United States, 18 Cl.Ct. 379 (1989); McClarrinon v. Secretary of H.H.S., No. 89–3V, slip op. (Cl.Ct. Oct. 20, 1989).

76. Tr. at 80.

77. Ex. 6 at 2.

78. Tr. at 79, 85.

79. § 300aa–15(a)(2).

80. § 300aa–15(e).

81. A retroactive case is one in which the vaccine was administered before October 1, 1988, the effective date of the Act.

82. § 300aa–15(b); Shepherd v. Secretary of H.H.S., 18 Cl.Ct. 774 (1989); Moorhead v. United States, 18 Cl.Ct. 849 (1989); Mikulich v. Secretary of H.H.S., 18 Cl.Ct. 253 (1989); 135 Congressional Record H9389, H9477, 101th Cong. 1st §§ 4402, 6601 (Nov. 21, 1989) (clarifying the $30,000 cap).

83. § 300aa–15(e).

84. § 300aa–15(e)(2).

85. 28 U.S.C. § 2412(d) (1982).

86. Although the EAJA rate is typically cited as $75, even under EAJA, the Claims Court and other federal courts "routinely" apply a cost of living increase to that base. See, Viktoria–Schaefer Intern. Speditionsgesellschaft, mbh & Co. v. U.S. Dept. of Army, 659 F.Supp. 85 (D.C.D. C.1987); Action on Smoking and Health v. C.A.B., 724 F.2d 211, 217 (D.C.Cir.1984) ("the cost of living language reflects congressional awareness that with inflation, the fee limiting provision could defeat the purpose of the statute"); see also, Cox Const. Co. v. U.S., 17 Cl.Ct. 29 (1989); Keyava Const. Co. v. U.S., 15 Cl.Ct. 135 (1988). Typically, the increase represents the rise in the Consumer Price Index for a particular city or class of cities from October 1, 1981 (the effective date of the statute) until the median date of services rendered. Kunz Const. Co., Inc. v. U.S., 16 Cl.Ct. 431, 439 (1989).

87. Compare Kue v. Secretary of H.H.S., 18 Cl.Ct. 777, at 779–780 (1989) (applying EAJA fees after finding insufficient evidence to demonstrate the reasonableness of the claimed fee) with Newton v. Secretary of H.H.S., 18 Cl.Ct. 665 (1989) (applying the lodestar figures to award $250 per hour).

88. See Lolley v. Secretary of H.H.S., 18 Cl.Ct. 498 (1989); Gregson v. H.H.S., 17 Cl.Ct. 19, special master's report at 7 (1989).

Act contains no fixed statutory ceiling; rather, the Vaccine Act instructs courts to determine "reasonable" attorneys' fees. Nowhere in EAJA does Congress characterize or is there any suggestion that $75 per hour is "reasonable" in light of counsel's ability or the work involved in a particular case.

Second, under EAJA, an attorney is allowed to pursue fees for providing the services in question from other sources. Allowing counsel to pursue alternative sources of fees suggests that Congress recognized that the $75 rate would be inadequate to reasonably compensate counsel. On the contrary, under the Vaccine Act, court-awarded fees are the exclusive vehicle for an attorney to receive compensation for time spent; counsel are explicitly precluded from recovering any additional fees directly from their clients. The Vaccine Act's legislative history reveals that Congress did "not intend that the limitation of fees to those included in the award act to limit petitioners' ability to obtain qualified assistance and intends that the court make adequate provision for attorneys' time." [89] It would circumvent Congressional intent to use $75 an hour as the divining rod for fees under the Vaccine Act where such a limitation serves to limit petitioner's ability to obtain qualified counsel.

Further, had Congress wanted to adopt an explicit hourly rate, they had ample opportunity to do so.[90] The EAJA cap was a product of legislative compromise: EAJA is essentially a sanction against the government, intended to "encourage reasonable [official] behavior during litigation." [91] However, Congress, recognizing the danger of providing unnecessary incentive to sue,[92] deliberately capped the amount which could be obtained from the government, making those monies available only to a prevailing party and only where the official action was not substantially justified.[93] Congress' reluctance to allow official misconduct or irresponsible conduct to drain the public fisc was central to the enactment of EAJA. It therefore would have been incongruous to further tax public coffers by awarding substantial attorneys' fees.

On the contrary, the Vaccine Act was intended to divert actions from traditional civil forums and encourage petitioners to file claims for compensation. In keeping with that purpose, where the government unsuccessfully opposes a petition, counsel are automatically entitled to a reasonable fee. In fact, counsel who file a claim in good faith with reasonable basis are compensated for their time under the Vaccine Act regardless of whether or not compensation ultimately is awarded. Accordingly, where counsel presents competent evidence in support of his or her fee application, it is unnecessarily interventionist and in fact contrary to legislative intent to graft on EAJA's $75 rate.[94]

---

**89.** H.R.Rep. No. 908, 100th Cong. U.S.Code Cong. & Admin.News 1986, pp. 6287, 6363 (1986).

**90.** In fact, Congress did choose to exercise such legislative prerogative where, in retroactive cases, it capped the total amount which could be recovered in attorneys' fees, costs, pain and suffering and lost wages. *See also, Save Our Cumberland Mountains, Inc. v. Hodel,* 857 F.2d 1516, 1523 (D.C.Cir.1988) (holding the $75 EAJA cap inapplicable to the Surface Mining and Control Act, a statute with a fee shifting provision and supporting legislative history which parallels that of the Vaccine Act). Moreover, Congress recently amended the Vaccine Act, explicitly clarifying attorney fee concerns. 135 *Cong. Rec.* H9389, H9476, 101th Cong. 1st. Sess. §§ 4401, 6601 (Nov. 21, 1989). Again, they chose to neither adopt a specific rate nor alter the standard of reasonable fee.

**91.** 135 *Cong. Rec.* H.R. 99–120 99th *Cong.* at 11 (May 15, 1985).

**92.** The legislative history of EAJA is clear that the statute should not "chill public officials charged with enforcing the law from vigorously discharging their responsibilities." H.R. 99–120 99th *Cong.* at 10 (May 15, 1985).

**93.** In signing the EAJA bill, President Reagan noted, that EAJA "was never intended to create an automatic fee award every time the government loses a case." Statement of the President on signing H.R. 2378 into law, 20 *Weekly Comp. Pres. Doc.* 966, 967 (Aug. 6, 1985).

**94.** Congress likened fee applications under the Vaccine Act to those "in a similar compensation program for Black Lung Disease," noting that in such cases, fees "have proven to be well below those that might be expected in litigation and

Finally, to adopt the EAJA fee scale in retroactive cases places counsel in an untenable ethical dilemma, particularly in instances such as this, where a prior civil action was filed. With the advent of the Vaccine Act, counsel are obligated to advise their clients of the advantages of pursuing a compensation petition,[95] with its streamlined processes, no-fault approach, and relaxed standards of proof. Were counsel compensated at a rate of $75, an attorney is forced to present this option, and in all likelihood receive significantly less than what might ordinarily be deemed a "reasonable" fee should the client elect to proceed under the Act and withdraw the civil proceeding. In most instances, counsel accepted cases under a contingent fee arrangement where the attorneys' percentile share in a successful suit far exceeds even what would be adjudged reasonable hourly fees under the lodestar. To do even further violence to those expectations by adopting the EAJA fee rate unnecessarily strains the attorney-client relationship.[96]

Under the lodestar approach, fees are determined by multiplying the reasonable hours expended by a reasonable hourly rate. The resulting figure is presumed to be a reasonable fee to which the petitioning attorney is entitled. *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983).

The fee applicant carries the burden of proof. To meet such burden, the applicant must submit evidence supporting the number of hours expended and the hourly rates claimed. As the Claims Court in *Martin v. United States* wrote:

A party submitting an application for an award of attorney fees should present evidence that supports hours worked at the rates claimed. Where supporting documentation is inadequate, the award may be reduced accordingly. A party who seeks payment must keep records in sufficient detail that a neutral judge can make a fair evaluation of the time expended, the nature and the need for the service, and the reasonable fee to be allowed.[97]

Counsel for petitioner has claimed $16,865 for attorneys' fees [98] and $8,808.65 for costs, for a total of $25,673.65.[99] Of that figure, the sum of $1,697.61 represents fees and costs for the prior civil action and $23,976.04 for this compensation proceeding. Specifically, petitioner claims expending 19.6 attorney-hours at a requested rate of $250 per hour, 19.1 attorney-hours at $150 per hour, and 52.8 attorney-hours at $125 per hour. Petitioner's costs are also itemized.[100] In addition, at the undersigned's request, counsel submitted supple-

have, in almost all cases, been less than $15,000." H.R.Rep. No. 99–908 100th *Cong.* U.S.Code Cong. & Admin.News at 6363 (1986). In the instant case, not only did counsel spend time in bringing this petition, but they are entitled to fees for a prior civil action as well. Nonetheless, at the claimed rates, petitioner's total fee request is virtually identical to the amount estimated by Congress.

**95.** § 300aa–10(b).

**96.** Compensating Vaccine Act attorneys at such a low rate may have negative residual consequences as well. It could encourage both the inflation of claimed hours and judge shopping, where counsel files multiple petitions, dismissing those assigned to a judge likely to render an unfavorable attorney fee decision.

**97.** *Martin v. United States,* 12 Cl.Ct. 223, 227 (1987), *citing, Hensley v. Eckerhart, supra.*

**98.** Petitioner's fee petition concludes with a request for $15,500 total fees for this petition, that

figure does not include those fees related to the prior civil action in this case.

**99.** *See* Application for Attorney Fees and Other Costs (filed Nov. 7, 1989) (hereafter "Fee Petition"). Originally, petitioner requested $5,140.47 in costs. That request included costs itemized on an expense sheet, paralegal costs, costs of the prior civil proceeding, and other related expenses. Counsel then filed a supplemental expense sheet, representing fees and costs associated with the hearing in the case. *See* Itemized Expense Sheet (filed Dec. 4, 1989). That itemized submission was intended to supplement the original request and did not include all of the costs originally claimed. Accordingly, the $8,808.65 figure represents the aggregate of costs claimed in both the initial and supplemental request. Counsel is advised that no future costs requests before this court be filed in a piecemeal fashion.

**100.** Fee Petition, Ex. 5, 6; Itemized Expense Sheet.

mental documentation,[101] further supporting his fee petition.

In calculating a reasonable hourly rate a court must consider the prevailing market rates in the relevant community for similar services by lawyers of comparable skill, experience, and reputation. *Blum v. Stenson*, 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984). The Supreme Court noted in *Blum* that

> determining an appropriate "market rate" for the services of a lawyer is inherently difficult.... To inform and assist the court in the exercise of its discretion [to award fees], the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.

*Id.* at 895 n. 11, 104 S.Ct. at 1547 n. 11.

Petitioner's attorneys, Anthony Colantoni and Martin Preiser, each claim a rate of $250 per hour. Both Mr. Colantoni and Mr. Preiser are senior partners in the firm, McDowell and Colantoni.[102] In justifying $250 per hour, counsel notes that hourly rates for attorneys in Chicago range from $104 to $500 for partners and principals.[103] In addition, Mr. Colantoni and Mr. Preiser each submitted an affidavit in support of their claimed hourly rate.

Mr. Colantoni's affidavit is from Robert J. Glenn, of Motherway and Glenn, a member of the Illinois bar, who affirms that $290 per hour[104] is a fair and reasonable rate for an attorney with the specialized experience, skill and knowledge of Mr. Colantoni. Mr. Glenn bases this conclusion on the following grounds: (1) Mr. Glenn's practice involves the representation of injury victims, including those suffering vaccine injuries; (2) although Mr. Glenn typically accepts such cases on a contingent fee basis, when he does charge an hourly rate, that rate is $250 per hour.[105]

Further, Mr. Glenn rests his belief of the reasonableness of Mr. Colantoni's rate on the fact that the firm, McDowell and Colantoni, Ltd., is "a litigation firm which over the past ten years has represented in excess of five hundred (500) families of victims of vaccine injury." Counsel further avers that,

> Members of the law firm are active with A.T.L.A.'s DTP Litigation Group, have consulted with Dissatisfied Parents Together in the drafting of the National Vaccine Injury Compensation Program, were charter members of Advocates For A Safe Vaccine and are recognized nationally as leaders in the field of vaccine litigation.[106]

Specifically with respect to Mr. Colantoni, Mr. Glenn states that,

> DPT vaccine litigation requires a specialized skill, knowledge and expertise in the areas of science, biology, microbiology, immunology, vaccinology, and medicine as it relates to all aspects of infant and child development; such knowledge and expertise is generally not possessed by experienced trial counsel.

Mr. Glenn attests to Mr. Colantoni's skill and expertise, particularly in light of Mr. Colantoni's 10 years of experience on behalf of vaccine victims. In addition, "Mr. Colantoni is also a member of the Advisory Commission on Childhood Immunizations to

---

101. *See* Supplemental Memorandum (filed Nov. 17, 1989) (hereafter "Supp. Memo."); Supplemental documentation and request for costs (filed by leave of the special master) (Dec. 4, 1989).

102. Fee Petition at 5.

103. Supp.Memo. at 5, *citing The National Law Journal* (Nov. 20, 1989).

104. In this case, although the affiant believes that $290 is a reasonable rate, counsel herein only requests $250.

105. Supplemental Affidavit of Robert J. Glenn at 1 (filed Dec. 4, 1989) (hereafter, "Glenn Aff."). In the original fee petition, counsel filed an affidavit in support of Mr. Colantoni's rate from Mr. Glenn. Petitioner then filed a supplemental affidavit, reflecting the basis of the conclusions drawn in the initial one.

106. Glenn Aff. at 2.

the Secretary of the Department of Health and Human Services." [107]

Mr. Glenn's affidavit is more than a mere conclusory statement of what rate is reasonable, made by a friendly attorney. It details why that particular rate is reasonable, looking to fees in the Chicago community, the complex and technical nature of the medical issues which pervade vaccine litigation, and the particular knowledge and skill of Mr. Colantoni, reflecting an implicit understanding of the lodestar factors. In addition the affidavit was made by someone who has represented DPT victims and accordingly has first hand knowledge of the issues involved in vaccine litigation. Moreover, Mr. Colantoni's claimed rate for Vaccine Act litigation has already been adjudged reasonable by the Claims Court. [108] Given the strong proof in this case and as the undersigned has. not found nor has the respondent offered any proof to the contrary, the undersigned concludes that $250 an hour for an attorney of Mr. Colantoni's skill and expertise is fair and reasonable.

As to the affidavit submitted by Mr. Preiser, Mr. Ronald Tutt, the affiant, has been licensed by the State of Illinois and practicing law in the Chicago area for the past seventeen years, and is therefor familiar with the relevant billing community. He believes Mr. Preiser's services in this particular case are worth $290 per hour. [109] Mr. Tutt bases this conclusion on the following factors: (1) the billing rates in the Chicago area for partners involved in complex medical malpractice or product liability suit range from $200 to $400 per hour; (2)

DPT litigation involves such complex medical issues; (3) he has personally worked with and consulted Mr. Preiser on legal matters, is familiar with his skill, and aware of his knowledge in DPT-related medical fields. Mr. Tutt also is cognizant of the role McDowell and Colantoni plays in the national vaccine community.

Although the proof submitted by Mr. Preiser is good, it does not rise to the level of specificity of that submitted by Mr. Colantoni. First, as Mr. Tutt has not personally represented DPT victims, his affidavit bears somewhat less probative weight than the affidavit of Mr. Glenn. [110] In addition, on the face of the proof submitted, it is unclear whether Mr. Preiser has assumed the same central national role in DPT-related issues as has Mr. Colantoni. However, as Mr. Preiser is a partner of the same level as Mr. Colantoni, the minor deficiencies in proof shall only serve to reduce his claimed rate to $225 per hour.

Petitioner requests a rate of $150 an hour for the time of Mr. Bruce Kiselstein, a member of McDowell and Colantoni, and Mr. Charles Paulson, who filed the prior civil action. Mr. Kiselstein has eleven years of experience in the practice of law, a substantial portion of which has involved the litigation of DPT vaccine injury cases. [111] Mr. Kiselstein submits an affidavit from Mr. Brian S. Zenner, a member in good standing of the Illinois bar, practicing with Bleiman & Zenner, a Chicago-based firm. [112] Mr. Zenner attests that $150 per hour is a fair and reasonable rate for a

107. *Id.*

108. *Newton v. Secretary of H.H.S., supra* (finding a rate of $250 per hour for Mr. Colantoni's services reasonable); *Siegfried v. Secretary of H.H.S.,* No. 88–68V *Special Master's Report* at 8–11 (Cl.Ct. Nov. 9, 1989) (finding a rate of $250 an hour for Mr. Colantoni's services reasonable; *see also, Cline v. Secretary of H.H.S.,* No. 88–71V, *slip op.* (Cl.Ct. Oct. 30, 1989) (awarding $290 for Mr. Colantoni's services rendered in the prior civil action and $150 for services under the Vaccine Act); *Ciotoli v. Secretary of H.H.S.,* No. 88–59V *slip op.* (Cl.Ct. Nov. 9, 1989) (finding a rate of $225 per hour for Mr. Colantoni's services reasonable); *accord Ionescu v. Secretary of H.H.S.,* No. 88–64V *Special Master's Report* at 23 (Cl.Ct. Oct. 19, 1989).

109. Affidavit of Ronald Tutt at 2 (filed Dec. 4, 1989) (hereafter "Tutt Aff."). Again, this court does not need to consider whether the services rendered warrant an award of $290 per hour as counsel only requests $250.

110. Nonetheless, the fact that Mr. Tutt is not only generally familiar with Mr. Preiser's work but has personally witnessed it and consulted with Mr. Preiser lends more credibility to his statements.

111. Fee Petition at 6.

112. Affidavit of Brian S. Zenner at 1 (filed Dec. 4, 1989) (hereafter "Zenner Aff.").

person of Mr. Kiselstein's specialized experience, skill, and knowledge. In support of that belief, Mr. Zenner further avers that like Mr. Kiselstein, he has been practicing law in the Chicago area for the past eleven years. In cases charging an hourly rate, Mr. Zenner charges $150 per hour. Mr. Zenner is familiar both with the complexity of medical issues involved in vaccine litigation and the familiarity of Mr. Kiselstein, who has worked on vaccine cases for the past six years, with those issues.[113] Mr. Zenner further appreciates the significance of being a vaccine litigator with the firm of McDowell and Colantoni, nationally recognized leaders in the field.

In light of the proof submitted, and given the level of rates in Chicago, the undersigned finds a rate of $150 per hour fair and reasonable for Mr. Kiselstein's time. Particularly, the hourly rate charged by someone of the same years of experience in the same legal community bears significant weight. In addition, Mr. Kiselstein's six years of vaccine litigation experience with McDowell and Colantoni further warrant the claimed hourly rate.

Similarly, the proof submitted in support of Mr. Charles Paulson's claimed rate is sufficient. Mr. Paulson initiated the prior civil action in this matter; therefore certainly for him, the fact that fees under the Vaccine Act arguably might be reduced is of no import. Counsel submits an affidavit from Elden M. Rosenthal who states that $150 per hour is a reasonable rate for the representation of persons with vaccine-related injuries by Mr. Paulson. Mr. Paulson practices in Portland, Oregon. Mr. Rosenthal, who has practiced for more than 17 years in Portland, Oregon has served on the Board of Governors of the Oregon Trial Lawyers Association, on numerous professional committees, and has been involved as both a litigant and an expert in many attorney fee hearings.[114] The affiant is familiar both with Mr. Paulson's reputation, skill, and experience as well as the

issues involved in claims of medical malpractice and unsafe pharmaceuticals. Keeping in mind the affiant's qualifications for attesting to fees of this type in the Portland area, $150 per hour for Mr. Paulson's time is found fair and reasonable.

Finally, the proof supporting Kenneth Moll's claimed rate entitles him to compensation at $125 per hour. Mr. Moll devotes the majority of his practice to vaccine injury cases and has represented petitioners before the United States Claims Court under the Vaccine Compensation Program.[115] Mr. Moll submits an affidavit in support of his claimed fee from David A. Upah, a member of the Illinois bar practicing in the Chicago area for the past seven years. Mr. Upah states that $125 for Mr. Moll's services in this case is fair and reasonable.[116] Mr. Upah's own hourly rate ranges from between $100 and $175 per hour. He notes that $125 per hour is well within the range of hourly billing rates for associates' services in the Chicago legal community. In attesting that such a rate is fair for Mr. Moll's services in this particular case, Mr. Upah states that he appreciates the particular complexities of DPT litigation. He knows Mr. Moll to possess the knowledge and skill necessary to bring a vaccine case and is cognizant of McDowell and Colantoni's national significance among vaccine litigators.

Moreover, the undersigned was favorably impressed by Mr. Moll's professional, knowledgeable and effective preparation and presentation, particularly at the hearing in this case. Accordingly, particularly in light of the Chicago market, Mr. Moll's participation in this matter, and that the majority of his practice with McDowell and Colantoni is devoted to vaccine litigation, the $125 rate is fair and reasonable for Mr. Moll's services.

This court notes that the level of complexity involved in Vaccine Act cases is not a reason to reduce the lodestar rate in this

---

**113.** Zenner Aff. at 2.

**114.** *See* Fee Petition, Ex. 2, Affidavit of Elden M. Rosenthal at 2 (hereafter "Rosenthal Aff.").

**115.** Fee Petition at 6.

**116.** Affidavit of David A. Upah at 2 (filed Dec. 4, 1989) (hereafter "Upah Aff.").

instance. Although Congress chose to provide petitioners with an alternative to the traditional civil forum, relax standards of causation, and ease rigid procedural rules, issues under the Act are nonetheless complex. Vaccine litigation requires counsel's extensive knowledge of biology, microbiology, immunology, neurology, pediatrics and infant and child development, and a variety of complex damage issues. It does not follow that simply because the legal issues have changed, and perhaps been simplified,[117] that significant skill is not required to competently represent a petitioner. The substantive issues of vaccine litigation remain complex, both factually and legally— it is merely the procedural framework which has simplified.[118]

To demonstrate reasonable hours worked, the applicant should provide contemporaneous time records and a personal affidavit in support of the fee petition. *Grendel's Den v. Larkin,* 749 F.2d 945, 952 (1st Cir.1984) (failure to keep records can result in a drastic reduction of fees). However, in reporting time expended, the applicant need not account for every minute— but counsel should at least identify the general subject matter of his claimed time expenditures. *Hensley,* 461 U.S. at 437 n. 12, 103 S.Ct. at 1941 n. 12. Once counsel appropriately identifies his time, those hours which reflect excessive, redundant, and otherwise unnecessary hours must be excluded by the court. In requesting statutory fees, an attorney must use the same billing judgment as an attorney would in billing a client. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority. *Id.* at 434, 103 S.Ct. at 1940 (emphasis added).

Many of petitioner's hours are well documented and accounted.[119] Each task is delineated with a reasonable and appropriate time expenditure attached, and no time appears excessive or redundant. There are, however, some hours which are based upon approximation, with no contemporaneous time records attached.[120] In assessing the reasonable number of hours spent in this case, this court recognizes that as the case was conceived under a contingent fee arrangement, counsel were forced to reconstruct their time records from actual copies of correspondence, pleadings, memos to file, phone records, etc. and accordingly are unlikely to remember every hour spent. Because the hours claimed in this case do not on their face appear excessive, the lack of contemporaneous time records will be reviewed with less exacting scrutiny than this court would normally entertain.[121] The undersigned is also aware of considerable expenditures of time by Mr. Moll, in submitting petitioner's Supplemental Memorandum and supporting documentation, for which no additional time has been claimed. Given the above considerations and as the total number of undocumented hours is not very large, this court finds all the claimed hours reasonable.

The allowable fees are therefore 14.6 hours at $250 per hour ($3,650), 15 hours at

---

**117.** In fact, in an Act in its infancy, with little developed precedent, the legal issues which arise are often novel and seldom predictable. The Vaccine Act has proven to be no exception.

**118.** One might ask whether a patent or tax attorney should be penalized because he or she presented their case in a mini-trial or ADR. The savings in terms of fees which simplified procedures offer is not in lowering the hourly rate, but in reducing the total number of hours an attorney must spend in bringing a particular claim. Plainly, the total number of hours claimed in this case is significantly less than if the petitioner had brought a full-blown civil suit.

**119.** *See* Fee Petition, ex. 3 (documenting Mr. Moll's hours); Fee Petition, ex. 4 (documenting Mr. Paulson's hours); Monteverdi hourly statements (filed Dec. 4, 1989) (documenting Mr. Preiser and Kiselstein's hours).

**120.** Specifically, no time records appear for Mr. Colantoni's claimed 14.6 hours. The statement by Mr. Preiser documents only 14.7 of a claimed 15 hours. Mr. Moll has contemporaneous time records for only 42.8 out of 52.8 hours.

**121.** However, the undersigned notes that should McDowell & Colantoni submit hours in this form in future cases, this special master shall review them with considerably more exacting scrutiny and disallow any which are undocumented, poorly documented, without appropriate notarization, or otherwise deficient.

a rate of $225 an hour ($3,375), 19.1 hours at $150 per hour ($2,865), and 52.8 hours at $125 per hour ($6,600). The allowable fees in this case total $16,490.

Petitioner originally requested $5140.47 in costs associated with this proceeding and the prior civil action.[122] Petitioner supplemented that request, claiming an additional $3,668.18 in expenses associated with the hearing in this case,[123] bringing the total in requested costs to $8,808.65. In calculating costs, virtually all of those attributed specifically to this case appear fair and reasonable. All reflect filing and expert fees, travel costs associated with the hearing in this case, postage, telephone, and other expenses which are a direct incidence of this particular litigation. Some costs supplementally claimed, however, are not adequately documented.[124] Petitioner's allowable costs are therefore awarded at $7,874.65.

The court finds the above adjustments to reduce the requested fees and costs to reasonable amounts. Accordingly, the undersigned recommends that the $250,000 judgment include an additional award of $24,364.65 for the petitioner's reasonable attorneys' fees and costs.[125]

With regard to Secretary's inactive role in this proceeding, it is recommended that the Court find the respondent in default in accordance with Vaccine Rule 55. The Secretary has been given ample formal notice of the hearing and every status conference. He has been given sufficient opportunities to actively participate, but has failed or refused to do so. By failing to timely answer or respond to this court's show cause order and post-hearing order, the Secretary has committed acts of omission which entitle this petitioner to a judgment by default. By abandoning this litigation, the Secretary has waived his rights to further participate in this case and should be precluded from any future reentry into this action.[126]

## CONCLUSION

In view of the foregoing, the undersigned recommends to the Court that petitioner be granted judgment for $274,364.65.

---

**122.** Fee Petition at 7.

**123.** *See* Supplemental fee documentation (filed Dec. 4, 1989) (hereafter "Supp. Fees").

**124.** There are two cost entries in the Supplemental Cost sheet, both dated Nov. 14, 1989—one for $1797.49 and one for $1868. Each is further itemized (the $943.38 entry for hotel costs represents accommodations for Mr. Moll and Mr. and Mrs. Monteverdi while staying in Washington D.C.). The breakdown of the $1,797.49 cost entry is reasonable; however, the only itemization of the latter entry is the $934.00 air fare for bringing the clients to the hearing. As $934.00 remains undocumented, it must be deducted from the petitioner's total expense request.

**125.** Of course, § 300aa–15(f)(4)(B), the Act's provision mandating the petitioner's award in retroactive cases be made in four annual installments, does not apply to attorneys' fees. Section 300aa–15(b) does refer to attorneys' fees with the awards for pain and suffering and lost wages as a permissible expenditure under the $30,000 umbrella in retroactive cases. Nonetheless, to read "compensation to a petitioner" for the purposes of § 300aa–15(f)(4)(B) to include attorneys' fees strains statutory logic. As incentive for attorneys to accept vaccine cases, Congress included a fee provision. Congress' vision of fees and costs as distinct from "compensation" is further evidenced since attorney's fees are available even where no compensation is awarded. § 300aa–15(e)(1). In addition, the statute explicitly forbids attorneys from engaging in alternative fee arrangements. § 300aa–15(e)(3). Finally, any other construction would unfairly penalize attorneys in retroactive cases, thereby discouraging them from accepting those petitioners as clients. Such an enigmatic result clearly was not contemplated by the statute. *See also,* 135 *Cong.Rec.* H9390, H9477, 101th Cong., 1st Sess. §§ 4402, 6601 (Nov. 21, 1989) (clarifying their intent that attorneys' fees be paid in one lump sum).

**126.** *Moorhead v. Secretary of H.H.S., supra; Hanagan v. Secretary of H.H.S.,* No. 88–25V, *slip op.* (Cl.Ct. Nov. 14, 1989).